ORTHO PHARMACEUTICAL CORPO-
RATION, a New Jersey corpora-
tion, Plaintiff,

v.

AMERICAN CYANAMID COMPANY, a
Maine corporation, Defendant.

Civ. No. 148–73.

United States District Court,
D. New Jersey.

July 30, 1973.

Riker, Danzig, Scherer & Brown by Dickinson R. Debevoise and Frank J. Miele, Newark, N. J., for plaintiff; Norman St. Landau, New Brunswick, N. J., of counsel.

Robinson, Wayne & Greenberg by Donald A. Robinson, Ronald J. Riccio, Newark, N. J., Peter J. White, Jr., and John M. Mackey, Wayne, N. J., of counsel (New York Bar), for defendant.

## OPINION

GARTH, District Judge:

This is an action arising under the Lanham Trade-mark Act of July 5, 1946, 60 Stat. 427, 15 U.S.C. §§ 1051–1127, for infringement of trademarks registered in the United States Patent Office and for unfair competition. Jurisdiction rests with this Court by virtue of 28 U.S.C. § 1338(a) and (b).

Ortho Pharmaceutical Corporation (hereinafter "Ortho") filed a complaint on February 2, 1973 against American Cyanamid Company seeking issuance of both a preliminary and a permanent injunction against the use of a proposed trade-mark by Lederle Laboratories (hereinafter "Lederle"), a division of American Cyanamid, and for an accounting. Plaintiff's application for a temporary injunction was denied by order dated March 26, 1973. The application for a preliminary injunction was submitted to the Court for determination without a jury on the basis of live testimony, affidavits, exhibits and the transcripts of testimony given upon oral depositions. Subsequently, both parties consented to the consolidation of the application for a preliminary injunction with that for final and permanent relief, so that the present determination by the Court will be dispositive of the action.

## FINDINGS OF FACTS

A. *Parties*

1. Plaintiff, Ortho Pharmaceutical Corporation ("Ortho"), is a corporation organized under the laws of the State of New Jersey (Complaint, para. 1).

2. Defendant, American Cyanamid Company is a corporation organized under the laws of the State of Maine (Complaint, para. 2; Answer, para. 2). Defendant, American Cyanamid has an unincorporated division known as Lederle Laboratories ("Lederle") (Rose Joint Exhibit 1 [hereinafter J–1] para. 1).

3. Ortho and Lederle are both well-known manufacturers of varied lines of medical and pharmaceutical products which are sold and distributed throughout the United States (Norman J–14 para. 2; Rose T. p. 1017–13 to p. 1022–13; Galbraith J–32 p. 14.5).

B. *Plaintiff's Development of the Drug and its Selection of "RhoGAM" as a Trade-mark*

4. The dispute herein involves the respective trade-marks given by the parties to a drug used principally in the treatment of Rh hemolytic disease of the newborn, a malady which may result in children being stillborn, or if born alive, may bring about illness, deformity or death (Norman J–14 para. 2; Freda T. p. 606–24 to p. 607–4).

The disease occurs as follows: When an Rh negative female, impregnated by an Rh positive male, gives birth to an Rh positive first child, the child may trigger the mother's "immune response": that is to say, the Rh positive blood cells from the child will pass through the placenta in large amounts into the mother's blood stream, usually at the time of labor and delivery, and thereby trigger in the mother's blood

stream the creation of an Rh antibody, sensitizing the mother's blood to any future contact with Rh positive blood. The first child will escape Rh hemolytic disease, but in the case of a future Rh positive child, the antibodies which have been developed in the mother's blood will pass over into that child's blood during pregnancy and attach themselves to the child's red cells, causing the Rh hemolytic disease and its serious consequences (Freda T. p. 606–7–23; Pollack J–34 p. 15.9–3 to p. 15.10–14).

Although labor and delivery is the most common situation in which the Rh negative mother's immune response (development of antibodies to Rh positive cells) is triggered, such a response may also be triggered by i) a fetal-maternal hemorrhage earlier in pregnancy (Gorman J–35 p. 16.24–18–20), ii) an abortion (Queenan T. p. 145–14), iii) a miscarriage (Judelsohn J–37 p. 19.7–1), or iv) a blood transfusion, whether or not related to a pregnancy situation, where an Rh negative woman is mistakenly given Rh positive blood (Queenan T. p. 145–10–14). In each of those situations, as well as in the labor and delivery situation, the mother may become immunized to Rh positive blood, and if she thereafter bears an Rh positive child, the child will be exposed to Rh hemolytic disease (Queenan T. p. 145–3–14).

5. As a result of extensive research begun in 1959, Ortho developed a product which prevents Rh hemolytic disease of the newborn by preventing Rh "sensitization" (passive immunization with Rh antibody) of the mother (Pollack J–34 p. 15.15–17 to p. 15.19–12; Freda T. p. 608–5 to 609–5). After clinical tests established that the product was safe and effective, it was licensed by the Bureau of Biologics in April 1968 (Freda T. p. 609–4–5; Norman J–14 para. 3; Johnson T. p. 415–13–15). The development of this new drug was described "as one of the major breakthroughs in obstetrics and gynecology of the decade." (Queenan T. p. 151–5–6).

6. The Bureau of Biologics (formerly the Division of Biological Standards of the National Institute of Health) authorizes Ortho's product for use for a period of one year after its issuance (Wampold T. p. 31–20 to T. p. 32–8). Originally, the Bureau authorized Ortho's new drug for use in the normal birth situation where an Rh negative woman requires one unit of the product. In March of 1973, the Bureau of Biologics approved it for use in two additional situations: (i) where an Rh negative woman has a larger than normal fetal bleed and requires a greater amount of the drug to prevent self immunization, and (ii) where an Rh negative man or woman is mistakenly given a transfusion of Rh positive blood and requires a very large amount of the drug to counteract the effect of the Rh positive blood (Wampold T. p. 32–14 to T. p. 35–7; Johnson T. p. 441–2 to T. p. 442–15).

7. During the 1960's while Ortho was developing its preventative of Rh hemolytic disease, the new product did not have an official generic name (Hare J–16 para. 10). It was called by various names, a common one being Rh immune globulin, a name which is still used in many scientific circles (Freda T. p. 620–13 to p. 621–11; T. p. 685 to T. p. 692).

8. Ortho devised the trademark RhoGAM for its new product. On June 21, 1966, Ortho made its first interstate shipment under the trade-mark RhoGAM, and on August 16, 1966, it filed a Statement and Declaration for Trademark Registration with the Commissioner of Patents for registration of the trade-mark RhoGAM. On October 3, 1967, the trade-mark RhoGAM was registered on the Principal Register of the United States Patent Office, Registration No. 836,219 (Hare J–16 para. 7, 8, 11).

9. On August 23, 1967, Ortho was informed that the Division of Biological Standards of the National Institute of Health (now the Bureau of Biologics) had assigned the new drug the generic name $Rh_o$ (D) Immune Globulin (Human) (Hare J–16 para. 10).

10. At the time when Ortho commenced selling RhoGAM and at the present time the symbol $Rh_o$ as used in the generic name $Rh_o$ (D) Immune Globulin (Human) and as used in referring to the most common form of the Rh factor, "$Rh_o$" (i) is spelled with a sub "$_o$" and not with a normal letter "o", and (ii) is pronounced R-h-o, stating each letter separately, and not as in the word "row".[1] This usage is in contrast to the "Rho" in RhoGAM, which (i) is spelled with a normal letter "o" and (ii) is pronounced as one syllable as in the word "row".[2] The "Rho" in the trade-mark RhoGAM has no independent scientific meaning. The medical experts called by Ortho and Lederle were not aware of any names of other drug products used in their field of practice which begin with that prefix (Queenan T. p. 158–11–13; Goodkin T. p. 1204–3–14; Dyer T. p. 1355–22 to T. p. 1356–6). The prefix "Rho" in "RhoGAM" is therefore a fanciful adaptation of the scientific symbol "$Rh_o$" (Vasington J–4 para. 2). "Rho" as used in RhoGAM is meant to be suggestive of the drug Rh immune globulin and of the disease it is designed to prevent. The suffix "GAM" was selected to suggest "gamma globulin" (alternatively known as "immune serum globulin") (Hare J–46 p. 28–17–25, p. 29–10–11; Pollack J–34 p. 15.107–8–24).

## C. *The Marketing of the RhoGAM*

11. In mid-1968, Ortho commenced selling RhoGAM (Johnson T. p. 414–17–19). Immediately prior to the release of the product, Ortho conducted and continues to conduct an extensive educational program designed to familiarize hospitals, blood banks, and physicians with the existence and purpose of the product RhoGAM (Johnson T. p. 415–13–21).[3] In furtherance of this program, Ortho's salesmen called personally on many hospital and blood-bank personnel and physicians to discuss and to promote the product (Wampold T. p. 16–1 to T. p. 17–7). All manner of literature was prepared and distributed to familiarize medical and hospital personnel with RhoGAM (Exh. D–38a–t; Johnson T. p. 428–12 to T. p. 429–24).

12. As a result of Ortho's intensive educational and selling efforts, RhoGAM became widely used in hospitals and blood banks throughout the United States. Although all doctors and patients may not use the product on all occasions when it is indicated, it is available in nearly all, if not all, hospitals in the United States performing obstetrical

---

[1]. The symbol "$Rh_o$" is part of the "Wiener" nomenclature system used to describe the most common form of the Rh factor present in the blood (Vasington J–4 para. 2). Less common Rh factors are indicated by the use of superscripts or subscripts other than the subscript "o" (Queenan T. p. 154 to 157; Exh. P–67; Dyer J–41 p. 16–6–11).

[2]. All of Ortho's experts testified to this effect (Queenan T. p. 158–1–20, T. p. 153–9–13; Freda T. p. 622–2–23, p. 621–17; Judelsohn J–37 p. 19.43–10 to p. 19.44–2, p. 19.16–12–23; Gorman J–35 p. 16.6–2–16).

All of Lederle's medical experts testified to this effect (Dyer J–41 p. 15–20 to p. 16–11, p. 16–12 to 17–18; Goodkin T. p. 1203–1 to p. 1204–2; Tiersten J–40 p. 19–4 to p. 21–12).

Although Cutter Laboratories which now produces $Rh_o$ (D) Immune Globulin (Human), issued a label in which the generic name used the term "Rho" instead of "$Rh_o$", a representative of the Bureau of Biologics stated that i) "the term '$Rh_o$' in the proper name is used only with the letter 'o' as a subscript", ii) "Cutter's use of this designation '$Rh_o$' is improper", and iii) the "Bureau of Biologics will take appropriate action to require Cutter Laboratories to use the proper name for the generic term." (Baughman J–19).

[3]. Programs, seminars and symposiums were conducted throughout the United States by trained Ortho personnel and by outside physicians retained by Ortho (Wampold T. p. 17–9–15). During the period from 1969 through 1972, approximately 700 such programs were conducted which reached approximately 14,000 medical technologists, residents, interns, pathologists, obstetricians, general practitioners and obstetrical nurses (Wampold T. p. 19–18 to T. p. 20–6; Johnson T. p. 419, p. 422 to p. 424–19).

work (Gorman J–35 p. 18.59–23 to p. 18.60–4; Johnson T. p. 414–20 to T. p. 415–4, T. p. 437–13 to T. p. 441–1).

13. In late 1971 or early 1972, Cutter Laboratories, Inc., entered the Rh immune globulin market with a product called "HypRho–D"; Dow Chemical Company entered the market with a product called "Gamulin Rh"; and the State of Massachusetts sold an Rh immune globulin which is not identified by a trade-mark (Norman J–14 para. 7; Wampold T. p. 29–5–21; Rose T. p. 1096–12–19).[4]

14. Despite the recent entry of other brands of Rh immune globulin into the market, Ortho's RhoGAM has about 90% of the market for the product (Wampold T. p. 106–21 to p. 107–5).

15. As a result of Ortho's development of this new product and its extensive educational and sales efforts since mid-1968, the product has become universally known in the field of obstetrics and gynecology and in that field, Ortho's trade-mark RhoGAM, has become, in effect, a household word (Dyer J–41 p. 59–7–10).[5]

D. *Lederle's Entrance into the Market and the Selection of its Trade-mark*

16. Lederle learned of the existence of Rh immune globulin by reading articles published by doctors associated with Ortho in its development of the product (Vasington J–24 p. 7.93).

17. In late 1967, Lederle decided to investigate the market for Rh immune globulin (Rose T. p. 1023–1–4). As a result of its market research, Lederle concluded in the fall of 1968 that it would proceed with the product (Rose T. p. 1026–10–13).

18. In preparation for its entry into the market, Lederle acquired full information concerning RhoGAM—its sales, the use made of it in hospitals and Ortho's educational and promotional literature relating to RhoGAM. Specifically, Lederle assembled representative samples of Ortho's promotional and educational materials for RhoGAM, including packages, journal ads, detail folios, patient information and booklets and patient cards (Rose T. p. 1094–16 to T. p. 1095–25).

In 1970, Lederle's market Research Group surveyed hospitals to determine their practices and policies with respect to the use and purchasing of Rh immune globulin. At that time RhoGAM was the only product on the market (Rose T. p. 1028–15 to p. 1029–3, T. p. 1090–13 to T. p. 1094–9).

19. Having acquired full knowledge of the trade-mark RhoGAM, of Ortho's literature and educational programs and of the dominant position of both the product and the trade-mark RhoGAM, in 1970 Lederle initiated a formal search for a trade-mark for its Rh immune globulin (Rose T. p. 1101–3–6).

20. By means of a communication dated January 26, 1970, (Exh. P–4B) Lederle's Product Manager in charge of Rh immune globulin, John H. Rose, requested Robert Oppenheimer, chairman of Lederle's Trade-mark Committee, to suggest names for the new product. Although the Bureau of Biologics had specified the generic name for the product in August of 1967 (Hare J–16 para. 10 Finding 9) and although Lederle and Rose had been studying the product since at least 1968 (Rose T. p. 1024–1–7), Rose's communication to Oppenhei-

---

4. The Bureau of Biologics has prescribed a dating period of six months from the date of issue for these brands (Wampold T. p. 32–11–12) as distinguished from RhoGAM's one year dating period. The newer products are not as yet authorized by the Bureau of Biologics for use in the situation of the larger fetal bleed or the mistaken transfusion of an Rh negative person with Rh positive blood (Wampold T. p. 35–8–14). *See* Finding 6 *supra.*

5. Although "Rho" as used in "RhoGAM" is not the "Rho" of the generic name (*see* Finding 10, notes 1 & 2, *supra*), "RhoGAM" has become such a strong mark that some physicians have come to pronounce the "Rho" of the generic name as the "Rho" in "RhoGAM" (Dyer T. p. 1357–1–8).

mer used the incorrect spelling "Rho" instead of the correct spelling "Rh$_o$" when setting forth the generic name, thus giving the Trade-mark Committee technically incorrect information as to the generic name (Exh. P–4B; Rose T. p. 1103–18 to p. 1105–14).

21. The sole function of Lederle's Trade-mark Committee was to suggest possible trade-marks. When it was proposing names for Lederle's Rh immune globulin it was not asked to and did not consider trade-marks of competitors, the product's market situation, or the legal trade-market issues involved, although the existence of and name "RhoGAM" was mentioned briefly in discussions (Oppenheimer J–26 p. 9.102–6–11, p. 9.-29–21–23, p. 9.55–3–6, p. 9.50–15–20; Nash J–28 p. 10.42–16–24, p. 10.43–5–8; Blake J–29 p. 12.20–2 to 12.21–5).

22. The procedure which the Trade-mark Committee generally followed, and which was followed in the selection of a trade-mark for Lederle's Rh immune globulin, was to list the generic name of the product on an agenda circulated among the members and to ask the members to submit suggestions at the next meeting (Oppenheimer J–26 p. 9.33–7–13, p. 9.112–13 to p. 9.113–9).

23. The Trade-mark Committee following the above procedure developed seven suggestions: (i) RHO–IMUNE, (ii) RHO–GLOBIN, (iii) D–IMUNE, (iv) D–MUNE, (v) IMUGEN–D, (vi) IMUGEN–R and (vii) RHO–GEST (Exh. P–4F). The letter "D" as used in these suggested trade-marks is in every respect the equivalent of "Rh$_o$" (Dyer T. p. 1367–20 to p. 1368–4; Queenan T. p. 154 to 155). The suggestions were forwarded to Rose by a memorandum dated March 3, 1970 (Exh. P–4F).

24. In response to the Trade-mark Committee's communications, Rose, who had extensive personal knowledge concerning both the product and the name RhoGAM and who had authority to select the trade-mark (Rose T. p. 1033–12–13), stated that he preferred one of the suggestions beginning with "Rho",

namely, "RHOGEST". He also stated that he liked two other names, each beginning with "Rho", namely, "Rhonil" and "Rhonyl" (Exh. P–4G). Both "Rhonyl" and "Rhogest" had been recommended to Rose by a Lederle physician in October of 1969 (Exh. P–4a).

25. Rose selected "RHOGEST" in the first instance (Rose T. p. 1035–2–5). In December 1970, Ortho objected to the trade-mark "RHOGEST" on the grounds that it was too close to RhoGAM (Exh. P–3). Lederle thereafter abandoned the mark "RHOGEST", in part because of Ortho's objection (Rose T. p. 1035–18 to p. 1036–17). Rose could see that the name RhoGest was too close to RhoGAM (Rose T. p. 1122–10–13). He stated: "It was mainly the "Rho", the generic prefix, coupled to a suffix that began with "G" that caused me to believe this." (Rose T. p. 1122–14–18).

26. In late December 1970, or January 1971, Rose selected another trade-mark also starting with "Rho", namely, Rho-Imune (Rose T. p. 1035–10 to p. 1036–21), to which Ortho again objected for the reason that it was too close to RhoGAM (Exh. P–13B).

27. "Rho-Imune" resembles "Rho-GAM" in that:

(i) They each start with the same syllable, pronounced as in the word "row," which is the identical fanciful adaptation of the well recognized scientific symbol "Rh$_o$" (Finding 10);

(ii) They each place emphasis upon the "Rho";

(iii) The suffix of each mark is suggestive of the same thing, namely, the substance known alternatively as gamma globulin or immune serum globulin (Oppenheimer J–8 para. 3; Pollack J–34 p. 15.107–8–24; Gorman J–35 p. 16.43–14–25; Rose T. p. 1043–5–8).

28. Rose stated that the reasons he had selected "Rho-Imune" were that:

(i) the prefix "Rho" was descriptive of the generic name and also related the use of the product to the disease for which the drug was intended; and

(ii) the suffix related to the fact that the product was intended to protect against a disease and was part of a family of Lederle names containing some variation of "Imune" (Rose T. p. 1041–9–24; Exh. D–69, D–70).

I find that the object sought by Rose in the selection of a trade-mark could have been achieved by the selection of a trade-mark other than "Rho-Imune". Rose's first objective could have been achieved equally as well or better by the use of the symbol "D" or the prefix "$Rh_o$" rather than the prefix "Rho". The letter "D" is an alternative nomenclature for "$Rh_o$" and is also a part of the generic name of the product (Queenan T. p. 154 to 155). Lederle's expert, Dr. Dyer, testified that "the large 'D' is coming into [prominence] now in representing this factor and it's very likely 'R-h-o' will be forgotten."[6] (Dyer T. p. 1367–20 to T. p. 1368–4). Three of the names submitted by the Trade-mark Committee contained the symbol "D"— D–IMUNE; D–MUNE; and IMU-GEN–D. See Finding 23 supra. Moreover, Rose's second objective was fulfilled by four of the trade-marks suggested by the Trade-mark Committee, all of which contained the component "imune" or "mune"—D–IMUNE, D–MUNE, IMU-GEN–D, IMUGEN–R (Exh. P–4F).

29. Lederle's package and package contents contain similarities to Ortho's package and package contents. Rho-GAM and Rho-Imune are each distributed in a package with a clear plastic cover (Exh. D–42 and Exh. D–1). The Cutter and Dow brands are not (Exh. D–7 and Exh. D–8). Both the RhoGAM and the Rho-Imune package contain a card designed to be given to the mother who is injected with Rh Immune Globulin. The legend and design of the blue Lederle card tracks the legend and design of the green Ortho card, word for word, except that there is substituted the word "Rho-Imune" for the word "RhoGAM", and the identifying name "Ortho Diagnostics" does not appear on the Lederle card (Rose T. p. 1140–1 to p. 1141–4; Exh. D–54; Exh. D–55).[7] Moreover, although the manufacturer's name Ortho Diagnostics appears on the plaintiff's card (Exh. D–54), no manufacturer's identification appears on the defendant's card (Exh.D–55).

Both the RhoGAM package and the Rho-Imune package contain a multi-part laboratory control form; the Rho-Imune form is substantially identical to the RhoGAM form in text and design (Exh. D–19, Exh. D–38b, Exh. D–51).

Both Ortho and Lederle distribute a booklet, written in English, in question and answer form, in order to provide patients with information about the product (Exh. D–38m, Exh. P–8, Exh. P–9, Exh. P–56).

In other respects, the packaging of the two products is dissimilar: (1) RhoGAM requires an independent syringe, whereas a disposable syringe containing the drug Rho-Imune is supplied in the Lederle package; (2) the Rho-GAM plastic box containing the literature and drug is square in shape, whereas the Rho-Imune plastic box containing the syringe (with drug) and literature is rectangular in shape; (3) the color and design of the exterior labels of the respective packages differ markedly (Exh. D–1, D–2).

Therefore, although I find that Lederle imitated certain aspects of the RhoGAM package, I find that, based on a comparison of the two packages alone, without considering the similarity in the names "RhoGAM" and "Rho-Imune", there exists no likelihood of confusion arising solely from packaging similarities.

---

6. Dr. Dyer also testified that "D-Immune" or "Anti-D Immune" or "D-Gam" would have all meant or suggested the same thing (Dyer T. p. 1367–20 to T. p. 1368–4).

7. The distinctiveness of the Dow patient identification card (Exh. P–68) and the Cutter identification card (Exh. P–69) demonstrates that there was no necessity for Lederle to imitate the Ortho card.

30. Taking into account the goodwill associated with the trademark RhoGAM (Finding 15) of which I have found Lederle was aware (Findings 18 and 19), the similarity between "Rho-Imune" and "RhoGAM" (Finding 27), the availability of alternative names fulfilling the trade-mark goals sought to be achieved by Rose (Finding 28), and the packaging similarities of Rho-Imune and RhoGAM (Finding 29), I find that Lederle selected the trade-mark "Rho-Imune" (as it had "RHOGEST") with the intention of appropriating or trading on the goodwill of the RhoGAM trade-mark.

E. *Likelihood of Confusion*

31. Rh immune globulin is used primarily in hospitals and blood banks; it is not sold to individual physicians for office use (Johnson T. p. 417–5 to p. 418–4).

32. The general procedure for the use of Rh immune globulin in hospitals is as follows: (i) if the patient is an Rh negative mother, umbilical cord blood is taken at the time of birth and sent to the blood bank or laboratory to determine if the child is Rh positive or Rh negative; (ii) the mother's physician is advised of the findings and if the child is Rh positive, the physician will order that Rh immune globulin be administered to the mother, normally by writing the order on the patient's chart; (iii) a nurse then will transcribe the physician's order from the patient's chart to a requisition form by means of which Rh immune globulin is ordered from the blood bank; (iv) at the blood bank the mother's blood is cross-matched against the Rh immune globulin to insure against incompatibility; (v) the blood bank personnel process the requisition and send out the Rh immune globulin for administration to the patient, usually by a nurse who may or may not be the nurse who received the order to administer the product from the physician (Queenan T. p. 158–21 to T. p. 169–11; Freda T. p. 627–23 to T. p. 632–3; Dyer J–41 p. 27–19 to p. 32–24; Goodkin J–38 p. 40–8 to p. 45–7). The details of these usual hospital procedures for the administration of Rh immune globulin may differ widely (*e. g.*, Judelsohn J–37 p. 19.12–20 to p. 19.15–17).

33. Some hospitals do or will stock more than one brand of Rh immune globulin, and therefore there exists some likelihood that RhoGAM and Rho-Imune will be stocked simultaneously in the same hospitals (*e. g.*, Goodkin J–38 p. 45–8–19; Queenan T. p. 161–5–13).[8] In such a situation, I find that doctors, nurses and others who use both RhoGAM and Rho-Imune in hospitals are likely to attribute to Rho-Imune the qualities and reputation that has come to be associated with RhoGAM, thereby giving Lederle an advantage in the utilization of its product by medical personnel that it would not have had if it had chosen a different trade-mark. This finding derives from RhoGAM's dominant market position (Finding 14) and "indoctrination" program centered around the trade-mark "RhoGAM" (Finding 15) and the similarity between the two trademarks—"RhoGAM" and "Rho-Imune" (Finding 27). I do not find that there exists a likelihood of confusion arising from illegibility in handwriting, despite testimony to the effect that doctors' handwriting is frequently difficult to read and that doctors may write postpartum orders under professional pressures (Freda T. p. 632–10 to p. 633–17; Queenan T. p. 171–1–16; Gorman J–35 p. 16.14–7–18).[9]

8. Even in hospitals which stock one brand depending upon the lowest price available, RhoGAM and Rho-Imune may be stocked simultaneously during the period while the supply of one brand is being exhausted and the supply of the new brand has just arrived (Goodkin J–38 p. 47–8 to p. 48–9).

9. One other possible area of confusion in the use of both RhoGAM and Rho-Imune within a single hospital exists. The records of some hospital blood banks would most likely not disclose what brand of Rh immune globulin was provided for a particular patient (Gorman J–35 p. 18.53–17 to p. 18.54–19). The

34. The large majority of hospitals will not simultaneously stock RhoGAM and Rho-Imune (Johnson T. p. 498–1 to p. 499–10; Tiersten J–40 p. 59–2–5; Dyer T. p. 1337–24 to p. 1338–3; Dyer J–41 p. 38–19–22; Rose T. p. 1048–1056, p. 1060–21 to 1061–25). In these circumstances, no opportunity for confusion or mistake in the actual use of Rh immune globulin *within a hospital* exists.

35. The procedures whereby hospitals purchase Rh immune globulin vary widely from hospital to hospital. The blood bank technician or chief of the laboratory may submit an order directly to the manufacturer; or the blood bank's order may go directly to the manufacturer; or the blood bank's order may go through a chain of procedures as it proceeds from the blood bank to a hospital purchasing department and from there to the manufacturer. Further, the training and education of the purchasing agents may vary widely (Wampold T. p. 40–11 to p. 42–24; Johnson T. p. 459–6 to p. 466–12). Usually, however, RhoGAM or Rho-Imune will be ordered in a face-to-face encounter by the purchasing agent with the Ortho or Lederle salesman (Gorman J–35 p. 18.25–24 to p. 18.26–5). As a result, a purchasing agent will infrequently if ever order the Lederle product thinking that he is in fact ordering the Ortho product.

36. The fact, however, that a purchasing agent or technician is likely to know that RhoGAM and Rho-Imune are the products of two separate companies does not negate the likelihood of mistake or psychological confusion. To the contrary, when used in the field of obstetrics and gynecology the symbol "Rho" has become so identified with Ortho and its product RhoGAM, that its use by Lederle in the trade-mark Rho-Imune is likely to cause the consumers of the product mentally to associate with Lederle the goodwill and the high reputation which Ortho has acquired in the trade-mark RhoGAM.

By way of example, Lederle's expert, Dr. Goodkin, asked two obstetrical nurses who had never heard the name Rho-Imune before what it meant to them. One of them asked Dr. Goodkin, "would that be something that would be similar to RhoGAM, would it be what would be given to Rh negative women?" (Goodkin J–38 p. 25–20–24). The other nurse told Dr. Goodkin that she thought that Rho-Imune was "something similar or the same as RhoGAM because of the generic name for the product." (Goodkin J–38 p. 63–14–18).

37. Taking into account (i) the dominant position which the RhoGAM name and product had in the Rh immune globulin market at the time Lederle selected the mark "Rho-Imune," (ii) the significance which the fanciful symbol "Rho" has acquired in hospitals and blood banks and among physicians, (iii) the similarity between the words "RhoGAM" and "Rho-Imune" (Finding 26) and (iv) the intent of Lederle to appropriate to its own advantage the significance attached to the symbol "Rho", by incorporating it into the mark "Rho-Imune," there is a likelihood of confusion, mistake or deception if "RhoGAM" and "Rho-Imune" are used as trademarks for Rh immune globulin.

F. *Public Health Factor*

38. Although RhoGAM and Rho-Imune are the same generic product and each has been approved by the Bureau

---

failure to keep records that indicate what brand was used might result in confusion as to potential liability for possible deleterious effects arising from the use of RhoGAM or Rho-Imune. Because of the similarity in names and in the appearance of the packaging, hos-

pital personnel might not remember what brand was actually administered. Of course the possibility of such confusion is reduced where the patient has retained the patient card (*see* Finding 29) to be given her at the time the serum is injected.

of Biologics for use in the normal pregnancy situation of an Rh negative mother who has an Rh positive child, there are differences between the two brands (Freda T. p. 713–17 to T. p. 714–13; Gorman J–35 p. 16.16–25 to p. 16.18–14):

(i) RhoGAM has a one year dating period, whereas Rho-Imune has a six month dating period (Wampold T. p. 31–30 to T. p. 32–13). *See* note 4 *supra.*

(ii) Ortho's organization originally developed Rh immune globulin; it has been engaged in testing it since 1960; and it has been marketing it since mid-1968 (Pollack J–34 p. 15.15–17 to 15.18–15; Johnson T. p. 414–17–19). Lederle, on the other hand, did not even commence investigating the possibility of manufacturing Rh immune globulin until late 1967 (Rose T. p. 1023–1–4) and has just begun to market the product (Rose T. p. 1059–14–21).

(iii) The Bureau of Biologics has authorized RhoGAM for use in the situation where an Rh negative woman has a larger than normal fetal bleed and in the situation where an Rh negative man or woman is mistakenly given a transfusion of Rh positive blood. *See* Finding 6 and note 4 *supra.* Rho-Imune has not as yet been authorized for those additional purposes (Wampold T. p. 32–14–25).[10]

### G. *Irreparable Injury*

39. Lederle's use of the trade-mark Rho-Imune will result in irreparable in-

---

10. Even though the Bureau of Biologics licenses a manufacturer's Rh immune globulin for sale, it does not guarantee the safety, purity and potency of the product nor does it certify that all Rh immune globulin are identical in all respects (Baughman J–18 para. 4).

11. I do not feel that the differences in authorization from the Bureau of Biologics are significant enough to create a health hazard in the event of confusion of brands. Although the Bureau of Biologics has not certified Rho-Imune for massive fetal bleeding or for mistaken

jury to Ortho by causing users of the product to associate with Rho-Imune and Lederle the goodwill and high reputation which Ortho has acquired in the trademark "RhoGAM."[11] Finally, Ortho does not have an adequate remedy at law.

### DISCUSSION AND CONCLUSIONS OF LAW

■■ The Lanham Trade-mark Act under which this action is brought defines "trade-mark" to include

"any word, name, symbol, or device or combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others."

15 U.S.C. § 1127. However, a name or symbol which is merely descriptive of an article of trade cannot be afforded legal protection as a trademark. 15 U.S.C. § 1052(e); Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L. Ed. 73 (1938); Q-Tips, Inc. v. Johnson & Johnson, 108 F.Supp. 845, 862 (D.N. J.1952), aff'd, 206 F.2d 146 (3d Cir.), cert. denied, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953); R. Callman, The Law of Unfair Competition, Trademarks & Monopolies, vol. 3, § 70.1, at 106. There can be no question here that "RhoGAM" is a proper trade-mark worthy of protection under the Lanham Trademark Act unless it is deemed to be "descriptive" by common-law standards in-

transfusion (*see* Finding 38 *supra*), it would appear that these situations would rarely arise (Barraro T. p. 1264–11–18; Dyer T. p. 1316–25 to p. 1317–4; p. 1325–21 to p. 1329–4). Moreover, should such a situation arise, nothing more than a larger than normal dose of the same product is indicated (Dyer T. p. 1319–19 to p. 1321–24). Theoretically, the two products are equally effective (Queenan T. p. 164; Dyer T. p. 1335 to 1338). It may well be that Rho-Imune will eventually be authorized for the same uses for which RhoGAM is now authorized.

corporated into the federal statute.[12] *See* Restatement of Torts, §§ 715(c), 722 (1938 ed.).

■■ The product in question bears the generic name $Rh_0$ (D) Immune Globulin (Human). Finding 9. In certain respects "RhoGAM" suggests this generic name (*see* Finding 10 *supra*), but that fact does not deprive it of trade-mark protection. *Q-Tips, supra,* 206 F.2d at 146; Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 906 (3d Cir. 1952). The commercial function of a trade-mark is to be both distinctive and suggestive; a trade-mark is designed at once to suggest the generic product and to differentiate the particular manufacturer's brand from those of competitors. Callman, *supra,* vol. 3, § 71.2, at 154, 155. In fact, it would seem that the Food & Drug Administration encourages pharmaceutical companies to adopt brand names "suggestive" of the product to be sold (Rose T. p. 1045).

The question presented to the Court in the first instance is whether "Rho-GAM" has exceeded its "suggestion" function such that it actually "describes" $Rh_0$ (D) Immune Globulin (Human). Although the distinction between suggestion and description may be at times a fine one, in the instant case a comparison of the trade-mark with the generic name dictates the conclusion that "RhoGAM" is not descriptive. First, as I have already determined, the initial syllable of the trade-mark Rho-GAM is not the "$Rh_0$" of the generic name but rather a fanciful adaptation of the scientific symbol "$Rh_0$". Also the syllable "GAM" in "RhoGAM" suggests that the drug is an immune globulin but is not descriptive of that fact. *See* Finding 10 *supra*. Further, even assuming "Rho" (pronounced as in "row") and "GAM" have descriptive qualities as individual syllables, combined together as one word they constitute a fanciful and distinctive mark worthy of trade-mark protection. *See* Q-Tips, *supra,* 206 F.2d at 146, 147.

■ Under the Lanham Trade-mark Act, defendant will have infringed upon the RhoGAM trade-mark if the use of "Rho-Imune"—defendant's name for its brand of the generic drug in question— "is likely to cause confusion, or to cause mistake, or to deceive." [13] 15 U.S.C. § 1114(1)(a). An important element in determining whether the confusing similarity standard prescribed by the Lanham Trade-mark Act has been met is the intent of the party adopting the allegedly infringing designation. *Q-Tips, supra,* 206 F.2d at 147; G. D. Searle & Co. v. Chas. Pfizer & Co., 265 F.2d 385, 386 (7th Cir.), cert. denied, 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65 (1959); Callman, *supra,* vol. 3, § 82.2(b)(2), at 789. I have already found that the defendant Lederle did in fact intend to infringe upon plaintiff's mark (Finding 30). Especially significant is the fact that out of all the names available, the individual responsible for selecting defendant's designation for the generic drug chose only names beginning with "Rho" (pronounced as in "row"), where-

12. The Lanham Trade-mark Act basically codifies the common law of trade-mark infringement and unfair competition. Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 905 (3d Cir. 1952); S. C. Johnston & Son, Inc. v. Johnson, 175 F.2d 176, 178 (2d Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949).

13. Prior to 1962, 15 U.S.C. § 1114(1)(a) read in pertinent part: "is likely to cause confusion, or to cause mistake, or to deceive *purchas-* *ers as to the source of origin of such goods or services.*" (emphasis supplied) The italicized portion was excised by amendment in 1962. Pub.L. 87–772, § 17, 76 Stat. 773. The legislative history suggests that the purpose of the amendment was to broaden the scope of the situations in which confusion would result in infringement. S.Rep.No.2107, 87th Cong., 2d Sess. (1962), 1962 U.S. Code Cong. & Admin.News pp. 2844, 2847, 2850. *See* Syntex Laboratories, Inc. v. Norwich Pharmacal Co., 437 F.2d 566, 568 (2d Cir. 1971).

as other designations could have fulfilled the goals he set for himself in choosing a trade-mark (Finding 28). The evidence here parallels that in the *Q-Tips* case, *supra,* and in G. D. Searle & Co. v. Chas. Pfizer & Co., *supra.* In both those cases, defendants were latecomers, as is the defendant here, in a field heavily dominated by the plaintiff (Finding 14). In both, as here, defendants had available alternative names for its product but chose designations extremely close in advertising allure to that of defendants. From these facts, the Third Circuit concluded in *Q-Tips*:

> "The evidence is convincing that defendant made its choice of "Cotton Tips" in order to come as close as it thought legally possible to "Q-Tips" and bask in the reflected popularity of plaintiff's name."

206 F.2d at 147. The same conclusion is appropriate here with respect to defendant's choice of "Rho-Imune."

■ The intent of defendant to trade upon the goodwill of plaintiff, however, is not itself dispositive of the case since other factors enter into the determination of "confusing similarity." *Q-Tips, supra,* 206 F.2d at 147. But the intent of the defendant to "bask in the reflected popularity of plaintiff's name" is significant in that it creates a presumption that the name chosen will in fact infringe upon the plaintiff's mark. Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 158 (9th Cir.), cert. denied, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963). If defendant

> "adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, his intent may be sufficient to justify the inference that there is confusing similarity. Since he [the defendant] was and is intimately concerned with the probable reaction in the market, his judgment manifested prior to the controversy, is highly per-

suasive. His denial that his conduct was likely to achieve the result intended by him will ordinarily carry little weight."

Restatement of Torts § 729, Comment f (1938 ed.).

■ The need to rely upon such inferences is all the more necessary in a case such as this where the defendant's product has yet to be widely marketed. In such a situation, plaintiff cannot and need not show that actual confusion, deception, or mistake has occurred; it suffices that such confusion is likely to occur. G. D. Searle & Co. v. Chas. Pfizer & Co., *supra,* 265 F.2d at 387, 388, 389.

■ In assessing the likelihood of confusion or mistake, the court must look to the actual consumers of the product in question. Syntex Labs, Inc. v. Norwich Pharmacal Co., 315 F.Supp. 45, 49 (S.D.N.Y.1970), aff'd, 437 F.2d 566 (2d Cir. 1971). Defendant contends that since the consumer group here consists of pharmacists, physicians, and highly trained hospital technicians, a higher degree of knowledge and discrimination in the selection and use of the product in question can be expected. *See* Callman, *supra,* vol. 3, § 81.2(c), at 599, 600; Warner-Hudnut, Inc. v. Wander Co., 280 F.2d 435, 436, 47 C.C.P.A. 1172 (1960). Additionally, because of the way in which the generic drug is ordered and used (Findings 31–35), the skilled consumer, says the defendant, will always know whether he is using the Ortho product or the Lederle product. Thus, the defendant concludes, no confusion or mistake can result.

■ It is true, and I have so found (Findings 35 and 36), that the pharmacist or hospital technician who orders $Rh_o$ (D) Immune Globulin (Human) is not likely to be confused as to the source of origin of the product by virtue of the similarity between the designations "RhoGAM" and "Rho-Imune" in the sense that this consumer will know that

each comes from a different pharmaceutical company.[14]  This is not a case in which the consuming class is consciously led to believe by the confusing similarity of trade-marks that defendant's product is actually produced or sponsored by the plaintiff.  *See, e. g.,* Hanson v. Triangle Publications, 163 F.2d 74 (8th Cir. 1947), cert. denied, 332 U.S. 855, 68 S. Ct. 387, 92 L.Ed. 424 (1948); Triangle Publications v. Rohrlich, 167 F.2d 969 (2d Cir. 1948).  Rather, this is a case in which confusion or deception occurs on a subliminal or subconscious level, causing the consumer to identify the properties and reputation of one product with those of another, although he can identify the particular manufacturer of each.  The trade-mark laws protect against this kind of psychological confusion implanted by similar trade-marks in the mind of a consumer.

"The protection of trade-marks is the law's recognition of the psychological function of symbols.  If it is true that we live by symbols, it is no less true that we purchase goods by them.  A trade-mark is a merchandising shortcut which induces a purchaser to select what he wants, or what he has been led to believe he wants.  The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol.  Whatever the means employed, the aim is the same —to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears.  Once this is attained, the trade-mark owner has something of value.  If another poaches upon the commercial magnetism of the symbol he has created, the owner can attain legal redress."

Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942) (Frankfurter, J.).  *See also* LaTouraine Coffee Co. v. Lorraine Coffee Co., 157 F.2d 115, 118 (2d Cir.), cert. denied 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663 (1946).  In the *Q-Tips* case, *supra,* infringement was found not because a consumer would believe that "Q-Tips" and "Cotton Tips" were manufactured by the same company, but rather because he would mentally associate with the product distributed under the name "Cotton Tips" what he had come to know about the heavily-advertised and well-known "Q-Tip".  Similarly, in the *Chas. Pfizer & Co.* case, *supra,* it cannot be said that a consumer would reasonably believe that "Bonamine" was produced by the manufacturer of "Dramamine"; rather, the evil of defendant's choice of the name "Bonamine" was that it was an attempt to "ride the coattails" of Dramamine's reputation.[15]  At stake in these cases was not the identity of the manufacturer but the identity and reputation of the product.[16]

There remains no doubt in my mind that "Rho-Imune" was selected to trade upon the goodwill that Ortho had invest-

14. It should be noted that the 1962 amendment to the Lanham Trade-mark Act, discussed in note 13 *supra,* excised the "source of origin" language of the original Act.

15. "In sum, both actions, i. e., trademark infringement as well as unfair competition, in addition to according legal protection to the property right which has been established in a given name, seek to insure that the public is not misled into purchasing or utilizing goods or services different from those sought by the pull and lure of a subtly devised parody of a familiar name or symbol.  To put it more directly, one cannot ride on the coattails of another's reputation where the indicia of that reputation is legally protected." Baker v. Simmons Company, 307 F.2d 458, 461 (1st Cir. 1962).

16. In defining trade-mark, one commentator has taken cognizance of this aspect of trade-mark protection.
"More recently, a trade-mark is intended less to indicate the source of a commodity than to identify the commodity itself for which a demand had grown on the strength of its name or mark." M. Radin, Radin Law Dictionary 348 (2d ed. 1970).

ed in its "RhoGAM" trademark. Moreover, in the minds of the class of consumers with which I am here concerned, I am convinced that "Rho-Imune" is likely to be confused with "RhoGAM". It is significant that two nurses, when asked what the name "Rho-Imune" meant to them, both immediately associated it with "RhoGAM" (Finding 31). This evidence, along with the other findings I have made, persuades me that this highly sophisticated and discriminating consumer class is not insulated from the psychological associations stemming from the strong "RhoGAM" trade-mark. *See* Dresser Industries, Inc. v. Heraeus Vacuum, Inc., 395 F.2d 457, 462 (3d Cir.), cert. denied, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968); Syntex Laboratories, Inc. v. Norwich Pharmacal Co., *supra*;[17] Morgenstern Chemical Co. v. G. D. Searle & Co., 253 F.2d 390 (3d Cir. 1958), reversing 150 F.Supp. 726 (D.N.J.1957); Technic, Inc. v. Sel-Rex Corp., 419 F.2d 1331 (C.C.P.A.1970).

For the reasons I have stated, I find that "Rho-Imune" infringes upon the plaintiff's valid and subsisting trade-mark "RhoGAM", thereby causing irreparable injury to the plaintiff. Franklin Mint, Inc. v. Franklin Mint, Ltd., 331 F.Supp. 827 (E.D.Pa.1971). Plaintiff is entitled to a permanent injunction restraining defendant from using "Rho-Imune" as a trade-mark for Rh$_o$ (D) Immune Globulin (Human) together with the costs of bringing this action.[18]

The parties shall submit an order consistent with this opinion within two weeks.

17. The same observation was made by Judge Mansfield in the *Syntex* case.

"We are well aware that the physicians and pharmacists whose potential confusion concerns us are specialists, accustomed to dealing with potent drugs, sensitive to distinctions and differences that would not strike the ordinary man as significant and accustomed to taking precautions commensurate with the potential consequences of error in their work. They are a sophisticated class of consumers, and our estimate of any 'likelihood of confusion' must take this into account. Nevertheless we cannot assume that they are immune from error, or gifted with endless powers of discrimination between medically related and almost identically named products."
Syntex Laboratories, Inc. v. Norwich Pharmacal Co., 315 F.Supp. 45, 51 (S.D.N.Y.1970), aff'd, 437 F.2d 566 (2d Cir. 1971) ("Vagestrol" infringes "Vagitrol").

18. From the proposed conclusions of law submitted by the plaintiff, and from the parties' agreement to treat the trial as one for final and permanent relief, it is apparent that plaintiff has abandoned the claim for an accounting asserted in the complaint, and therefore such claim for relief will be denied with prejudice.