**RE: McNEIL LABORATORIES, INCORPORATED**

v.

**AMERICAN HOME PRODUCTS CORPORATION**

Civ. A. No. 76–298.

United States District Court, D. New Jersey.

April 7, 1976.

Philip J. Albert, Gerald A. Hughes, Levy, Levy, Albert & Marcus, Trenton, N. J., Thomas C. Morrison, Peter M. Dugre, Rogers & Wells, New York City, for plaintiff.

Mark Z. Segal, Coleman, Lichtenstein & Segal, Trenton, N. J., John A. Reilly, Paul H. Heller, Albert J. Breneisen, Philip J. McCabe, Martin P. Michael, Kenyon & Kenyon, Reilly, Carr & Chapin, New York City, for defendant.

BARLOW, District Judge.

This is an action for trademark infringement.[1]  Plaintiff, McNeil Laboratories, Inc. ("McNeil"), is a Pennsylvania corporation. Defendant is American Home Products Corporation ("AHP"), which is organized under the laws of Delaware and has its principal place of business in New York City, New York.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1338.  The case currently is before the Court on plaintiff's application for a preliminary injunction.

Both McNeil and AHP are engaged in the manufacture and sale of pharmaceutical products.  Since 1955, McNeil has distributed a product named "TYLENOL", a non-aspirin analgesic.  McNeil obtained federal registration of the "TYLENOL" trademark in 1956 and again in 1970.  Over the years, "TYLENOL" has become an extremely successful commercial product and now accounts for approximately ninety per cent (90%) of the non-aspirin analgesic market. Recently—on a limited basis—AHP began to market its new non-aspirin analgesic known as "EXTRANOL".  "EXTRANOL" tablets contain 486 milligrams of the active ingredient (acetaminophen), as compared to the 325 milligrams contained in "TYLENOL" tablets.[2]  Plaintiff complains that

1.  Plaintiff also alleges two other claims for relief: (1) a claim for false and misleading markings and designations of origin of goods; and (2) a claim for false descriptions and representations of goods.  These claims both arise under 15 U.S.C. § 1125(a).  In light of our holding on the trademark infringement claim, we need not reach these additional claims.

2.  McNeil now markets an extra-strength *capsule,* and soon will market an extra-strength

the use of the "EXTRANOL" trademark infringes its federally-registered "TYLE-NOL" mark.

This matter was initially presented to the Court on March 15th, 1976, when plaintiff applied for a temporary restraining order. On that occasion, the Court tentatively determined that the "EXTRANOL" mark did, indeed, infringe the "TYLENOL" mark, and we temporarily restrained AHP from embarking on a proposed television advertising campaign designed to promote "EX-TRANOL" in the New England market. Upon a careful review of the exhibits, affidavits, and testimony presented in connection with this application for a preliminary injunction, we remain satisfied that the "TYLENOL" trademark is being infringed by AHP's use of the "EXTRANOL" mark.

█ In order to establish trademark infringement under the Lanham Trade-Mark Act, 15 U.S.C. § 1051, et seq., a plaintiff must demonstrate that the allegedly infringing mark "is likely to cause confusion, or to cause mistake, or to deceive". 15 U.S.C. § 1114(a). See Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc., 395 F.2d 457, 462 (3d Cir.), cert. denied, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968). Actual instances of confusion or deception need not be shown. See Family Circle, Inc. v. Family Circle Associates, Inc., 332 F.2d 534, 539–40 (3d Cir. 1964); Ortho Pharmaceutical Corp. v. American Cyanamid Co., 361 F.Supp. 1032, 1043 (D.N.J.1973). The "likelihood of confusion" test contemplates essentially a factual inquiry. Among the factors to be considered are the intent of the defendant in adopting the allegedly infringing mark, the similarity in the sound and appearance of the marks, the type of products involved, the method of merchandising, and evidence of actual confusion.[3] See J. B. Williams Co., Inc. v. Le Conte Cosmetics, Inc., 523 F.2d 187, 191 (9th Cir. 1975); Q-Tips, Inc. v. Johnson & Johnson, 206 F.2d 144, 147–8 (3d Cir.), cert. denied,

346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953); Ortho Pharmaceutical Corp. v. American Cyanamid Co., supra, 361 F.Supp. at 1042–44.

█ In the present case, quite clearly, the only similarity between the "TYLE-NOL" mark and the "EXTRANOL" mark is the use of the suffix "NOL" in each of the marks. While the use of a suffix identical to one used in a registered trademark does not in itself create liability for trademark infringement, see, e. g., K–S–H Plastics, Inc. v. Carolite, Inc., 408 F.2d 54 (9th Cir.), cert. denied, 396 U.S. 825, 90 S.Ct. 69, 24 L.Ed.2d 76 (1969) ("CAROLITE" does not infringe "K–LITE"); Upjohn Co. v. Schwartz, 246 F.2d 254 (2d Cir. 1957), ("Syrocol" does not infringe "Cheracol"), such usage of an identical suffix is actionable under certain circumstances. See, e. g., Harold F. Ritchie, Inc. v. Chesebrough-Pond's Inc., 281 F.2d 755 (2d Cir. 1960), ("Brylcream" infringed by "Valcream"); G. D. Searle & Co. v. Chas. Pfizer & Co., 265 F.2d 385 (7th Cir.), cert. denied, 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65 (1959), ("Dramamine" infringed by "Bonamine"); Q-Tips, Inc. v. Johnson & Johnson, supra ("Q-Tips" infringed by "Cotton Tips"). We think the circumstances in the present case are such that AHP's use of the suffix "NOL" for a non-aspirin analgesic infringes McNeil's "TYLENOL" trademark.

█ A major reason for our decision is the confusion which likely will result from the juxtaposition of the prefix "extra" and the suffix "nol". In our view, an uninformed consumer would very likely be led to believe that "EXTRANOL" was an extra-strength version of "TYLENOL". That danger is exacerbated here because McNeil does, in fact, market an extra-strength "TYLENOL" capsule, and soon will market an extra-strength "TYLENOL" tablet. Thus, it is not at all inconceivable that a consumer might enter a store to purchase the new extra-strength "TYLENOL" and,

---

tablet. These products contain an amount of acetaminophen slightly in excess of that contained in "EXTRANOL".

**3.** This list does not purport to be all-inclusive.

instead, buy "EXTRANOL"—assuming that McNeil markets its extra-strength product under that name.[4] Such confusion is made more likely by the fact that both "EXTRANOL" and "TYLENOL" are sold in packages with a predominantly red-and-white color scheme.[5]

Our finding of infringement also finds support in a consumer survey conducted on behalf of AHP. Among other things, this survey tested consumer reaction to a group of five possible names for AHP's new analgesic product. The proposed names were: "DI–EXSAL", "DIREXIN", "ENDOMIL", "SALOXIUM", and "EXTRANOL". Fifty-eight per cent (58%) of the fifty respondents preferred the name "EXTRANOL". Of these, approximately thirty per cent (30%) (9 out of 29) mentioned that the suffix "NOL" was similar to the "NOL" in "TYLENOL". Nonetheless, AHP went ahead with its plan to market its new product as "EXTRANOL". We are persuaded that this action evidences an intent to capitalize on the popularity of a competitor's product and trademark.

AHP has attempted to minimize the significance of its own survey by offering the testimony of Dr. Joseph G. Smith, an expert in consumer surveying techniques. Dr. Smith testified that it was natural for respondents in AHP's survey to mention "TYLENOL" in choosing the name "EXTRANOL"—because the preceding questions in the survey were designed to produce a comparison between AHP's new product and "TYLENOL". Dr. Smith illustrated his point by conducting his own survey, in which the respondents were asked to compare the same five proposed product names without the "bias" he suggested was induced by the comparisons with "TYLENOL". In Dr. Smith's survey, forty-seven per cent (47%) of the 114 respondents preferred "EXTRANOL". Of these, only two out of fifty-four interviewees mentioned the name's similarity to "TYLENOL". While we find Dr. Smith's testimony to be interesting, the fact remains that AHP officials were aware only of the *original* survey results at the time it was decided to market their new product as "EXTRANOL".[6] Moreover, we think it significant that even Dr. Smith's "pure" survey included two individuals who chose "EXTRANOL" in part because of its similarity to "TYLENOL".

Under all of these circumstances, we think that AHP was under an obligation to differentiate its trademark from McNeil's. The Second Circuit Court of Appeals set forth the applicable principles many years ago:

"It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of his competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them." *Florence Mfg. Co. v. J. C. Dowd & Co.*, 178 F. 73, 75, 101 CCA 565 (2d Cir. 1910), quoted in

4. Other than a hearsay report from a McNeil representative in New England, which we have not considered due to its questionable admissibility, there is no evidence before the Court of actual confusion between "TYLENOL" and "EXTRANOL". Proof of actual instances of confusion, of course, is not required in a trademark infringement action. See *Ortho Pharmaceutical Corp. v. American Cyanamid Co., supra*, 361 F.Supp. at 1043. Indeed, such proof often is unavailable where, as here, the defendant's product has yet to be widely marketed or promoted. See *id.*

5. Unquestionably, the shades of red used, and the designs of the packages, are somewhat different. We do not mean to suggest, therefore, that defendant's packaging in itself creates any basis for liability.

6. Apparently the name "EXTRANOL" was suggested to AHP by an advertising agency. AHP was using the name "EXTRANOL" in connection with its new product shortly before the initial survey results became available on August 22nd, 1974. In light of the possible consumer confusion evident from the survey results, however, AHP could have—and, in our view, should have—adopted a new name for its product well before the product was ready for marketing in January, 1976.

*Harold F. Ritchie, Inc. v. Chesebrough-Pond's Inc., supra,* 281 F.2d at 758.

See also *G. D. Searle & Co. v. Chas. Pfizer & Co., supra,* 265 F.2d at 387; *E. I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.,* 393 F.Supp. 502, 510 (E.D.N.Y.1975). Here, instead of adhering to that requirement, AHP chose a mark which closely approached its competitor's "TYLENOL" mark, and presumably thereby to "bask in the reflected popularity of plaintiff's name". *Q-Tips, Inc. v. Johnson & Johnson, supra,* 206 F.2d at 147.

In our view, the present case is closely analogous to the *Q-Tips* and *G. D. Searle* decisions, in which infringement was found. "In both these cases, defendants were latecomers, as is the defendant here, in a field heavily dominated by the plaintiff . . . In both, as here, defendants had available alternative names for its product but chose designations extremely close in advertising allure to that of defendants." *Ortho Pharmaceutical Corp. v. American Cyanamid Co., supra,* 361 F.Supp. at 1043. Accordingly, on the present state of the record, we find that AHP's "EXTRANOL" mark infringes McNeil's "TYLENOL" mark.

■ AHP's various defenses to McNeil's infringement action are not persuasive. First, it is argued that the suffix "NOL" is a generic term describing the principal ingredient of non-aspirin analgesics like "TYLENOL" and "EXTRANOL". That ingredient is acetaminophen—also known as acetaminophe*nol.* While it is true that a generic or descriptive name for a product ordinarily is not entitled to trademark protection, see *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 116–19, 59 S.Ct. 109, 83 L.Ed. 73 (1938); *Q-Tips, Inc. v. Johnson & Johnson, supra,* 206 F.2d at 146, AHP's attempt to apply this doctrine in the present

case suggests several flaws. Initially, the suffix "nol", while perhaps significant to the pharmaceutical trade or to chemists, would not appear to be meaningful to the consuming public. Therefore, the term cannot truly be considered "generic" or "descriptive". Compare *Kellogg Co. v. National Biscuit Co., supra.* Moreover, AHP's own vice-president, who selected the "EXTRANOL" name, saw no significance in the suffix "nol". See Deposition of John Savage, at p. 23. Apparently, the principal national competitors of McNeil see no significance in "nol" either, because none of them has seen fit to use the term in connection with their products. Instead, they use the names "DATRIL", "TRILIUM", and "BAYER NON–ASPIRIN". Indeed, "TRILIUM" is marketed by AHP itself.

■ We also find no great importance in the usage of the "nol" suffix by a number of chain stores and small manufacturers which distribute analgesic products. These products command five per cent (5%) or less of the total market. Several of these concerns have entered into negotiations with McNeil, and significantly modified their marks and packaging in response to McNeil's objections. In any event, McNeil is under no obligation to bring actions against all infringers of its mark in order to preserve its right to bring an action against AHP. See *United States Jaycees v. San Francisco Jr. Chamber of Commerce,* 354 F.Supp. 61, 73 (N.D.Cal.1972), *aff'd,* 513 F.2d 1226 (9th Cir. 1975). Nor do we think that McNeil's grant of permission to certain small manufacturers to use the "nol" suffix constitutes a recognition by McNeil that it has no exclusive rights in the suffix. See *id.; cf. Standard Oil Co. v. Standard Oil Co.,* 141 F.Supp. 876, 889 (D.Wyo.1956), *aff'd,* 252 F.2d 65 (10th Cir. 1958).[7]

7. The principal case cited by defendant on this issue, *California Fruit Growers Exchange v. Sunkist Baking Co.,* 166 F.2d 971 (7th Cir. 1947), is inappropriate. In that case, the court simply held that defendant's use of the name "Sunkist" for its bakery products was not likely to cause confusion or mistake because plaintiff sold only *fruit* products under their federally-registered "Sunkist" and "Sun-Kist" trade-

marks. Although the court relied in part upon an agreement between the plaintiffs to allow each other to use the "Sunkist" or "Sun-Kist" marks, there is no suggestion in *California Fruit Growers* that a trademark owner's grant of permission to another to use the same or a similar mark in itself constitutes a defense to a trademark infringement action. Rather, such permission was considered in *California Fruit*

■ Finally, the doctrine of laches does not bar McNeil's lawsuit. In the July 31, 1974, issue of the weekly bulletin of "Trademark Bureau of Pharmaceutical Manufacturers Association", AHP publicly announced its intention to use "EXTRANOL" as a trademark for an analgesic preparation. Someone at McNeil apparently noticed the proposed trademark, and marked the item. Whether by oversight or conscious decision, no action was taken by McNeil until January, 1976, when it was learned that AHP had actually begun to market "EXTRANOL". At that time, this lawsuit was filed. In our view, these circumstances do not amount to a laches or estoppel defense. McNeil is under no obligation to protest every possibly infringing mark which appears as a proposal in a trade journal. We are aware of no case in which inaction such as McNeil's was held to constitute laches. Indeed, the Seventh Circuit Court of Appeals has held specifically that publication in a trade journal, plus a failure by plaintiff to register a protest, does not constitute a defense to a trademark infringement action. *G. D. Searle & Co. v. Chas. Pfizer & Co., supra,* 265 F.2d at 389.

■ The laches defense is reserved for those rare cases where a protracted acquiescence by plaintiff induces a defendant to undertake substantial activities in reliance on the acquiescence. See, *e. g., Safeway Stores, Inc. v. Safeway Quality Foods, Inc.,* 433 F.2d 99, 103 (7th Cir. 1970). In the present case, we are convinced that McNeil filed this lawsuit as soon as practicable after learning that AHP actually intended to enter the national market with an infringing trademark. We decline to hold that McNeil's failure to protest sooner bars the present lawsuit.

■ Since we have determined that plaintiff is likely to succeed on the merits of its trademark infringement claim, the only question remaining is whether a prelimi-

nary injunction is appropriate here. We think it is. Although AHP insists that any injury suffered by McNeil is remediable by money damages, it is well-settled in trademark infringement cases that loss of good will is sufficient irreparable injury to justify the issuance of a preliminary injunction. See *Tefal, S. A. v. Products Int'l Co.,* 529 F.2d 495 (3d Cir., 1976). Quite obviously were this Court to permit AHP to market its new analgesic product as "EXTRANOL", some consumers would buy it instead of "TYLENOL". Such consumers, if they are confused as to the origin of "EXTRANOL", as we think probable, would associate the good will attaching to "TYLENOL" with the new AHP product. It would be extraordinarily difficult to translate this loss of good will into money damages. Nor would it be a simple matter to calculate in damages the value of the customers who would be forever lost to "TYLENOL" were we to permit AHP to continue to market "EXTRANOL". "EXTRANOL", it must be emphasized, is intended to become a major, nationwide product, and will be vigorously and aggressively advertised and otherwise promoted. In these circumstances, we are satisfied that the irreparable injury requirement is fulfilled here.

■ Further, we see no "public interest" or "balance of equities" reason for denying preliminary injunctive relief. While the public surely is interested in vigorous competition, as defendant suggests, the public is equally interested in fair competitive practices and clearly opposed to being deceived in the marketplace. The "balance of equities" inquiry similarly favors preliminary injunctive relief. The relatively minimal injury likely to be suffered by AHP (in New England only) is more than counterbalanced by the danger of irreparable injury to McNeil were the "EXTRANOL" sales and promotion activities permitted to continue and to expand. Moreover, since we are convinced that the

*Growers* to be one of the factors considered in assessing the "likelihood of confusion" between a registered mark and an allegedly infringing mark. Here, as discussed *supra,* we consider McNeil's grant of permission to use

the "nol" suffix to be quite insignificant in light of the market position of the manufacturers involved and the context in which each such permission was granted ( *i. e.,* the amicable settlement of threatened litigation).

"EXTRANOL" mark infringes the "TYLE-NOL" mark, our injunction against the use of "EXTRANOL", effective now, will avoid substantial future expenditures by AHP in the promotion of a product bearing an infringing mark. See *George Washington Mint, Inc. v. Washington Mint, Inc.,* 349 F.Supp. 255, 263 (S.D.N.Y.1972).

In accordance with this opinion, a preliminary injunction against the further distribution or promotion of "EXTRANOL" will be entered. The foregoing should be considered the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a). An order consistent herewith will be submitted.