**KOPPERS COMPANY, INC., Plaintiff,**

v.

**KRUPP–KOPPERS GmbH, Defendant.**

Civ. A. No. 80–78.

United States District Court,
W. D. Pennsylvania.

March 19, 1981.

838

Alfred T. Lee, Milgrim, Thomajan, Jacobs & Lee, New York City, Herbert J. Zeh, Jr., Robert D. Yeager, Pittsburgh, Pa., for plaintiff.

James Mollica, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa., for defendant.

## OPINION

TEITELBAUM, District Judge.

The Koppers Company, Inc. ("Koppers Co.") of Pittsburgh, Pennsylvania, brought this action against Krupp-Koppers GmbH ("Krupp-Koppers") of Essen, Germany and Krupp International, Inc. of Harrison, New York.[1] Jurisdiction was based upon 15 U.S.C. § 1121, 28 U.S.C. § 1338(a) and (b) and 28 U.S.C. § 1332. Plaintiff charged that the use by defendant of the mark and name KRUPP–KOPPERS in the United States infringed upon its rights under its federal service mark and trademark registrations of KOPPERS; that the use of such mark and name was a false representation of the origin and quality of defendant's services; that such use constituted unfair competition at common law; and that such use was a wrongful dilution of plaintiff's distinctive mark and name in violation of the anti-dilution laws of various states. Plaintiff further charged that defendant had wrongfully represented to potential customers of plaintiff that defendant owned a certain coal gasification process (the KOPPERS–TOTZEK or K–T process). Defendant denied the allegations of plaintiff, raised equitable affirmative defenses, and asserted a counterclaim. Defendant's counterclaim closely paralleled plaintiff's claim and charged that the use by plaintiff of the mark KOPPERS-TOTZEK infringed upon defendant's common law rights in this mark, that the use of such mark was a false representation of the origin and quality of plaintiff's services; that such use constitut-ed unfair competition at common law; and that such use was a wrongful dilution of defendant's distinctive mark in violation of the anti-dilution laws of various states. Defendant further charged that plaintiff had disclosed or threatened to disclose defendant's confidential information relating to the subject coal gasification process, and had violated or threatened to violate confidentiality provisions of a licensing agreement between the parties.

Both parties filed motions for preliminary injunctions. Plaintiff seeks to enjoin defendant *pendente lite* from using the mark or name KOPPERS in the United States. Plaintiff also seeks to enjoin defendant *pendente lite* from asserting proprietary and exclusive rights to the subject coal gasification process. Defendant seeks to restrain plaintiff *pendente lite* from using the marks KOPPERS–TOTZEK and K–T as they relate to the subject coal gasification process.[2] Thus, at this juncture, three requests for preliminary injunctive relief are before this Court.

### The Parties

Koppers Co. is a Delaware corporation with its principal offices in Pittsburgh, Pennsylvania. Its principal activities involved in this litigation are those of its Engineering and Construction Group which engages in the design, engineering, and construction of coal gasification plants, coke oven plants, sintering plants, and blast furnaces. The other corporate groups of Koppers Co. are the Road Materials Group, the Organic Chemicals Group, the Engineered Metal Products Group, and the Forest Products Group.

Krupp-Koppers is a totally separate entity from and has no corporate relationship to Koppers Co. It is a German corporation

1. Subsequent to the filing date, the parties stipulated to dismiss Krupp International from the action, without prejudice. Accordingly, all further reference is to "defendant."

2. Defendant had also sought to restrain plaintiff *pendent lite* from using or disclosing confi-dential information received from defendant under the licensing agreement. This part of defendant's motion was later withdrawn when the parties agreed that plaintiff would abide by certain procedures relating to this information until final disposition of defendant's claim.

with its principal offices in Essen, Germany. Krupp-Koppers is a process engineering company *i. e.* it sells services, but does not manufacture goods or products. Its activities are similar to those of Koppers Co.'s Engineering and Construction Group.

A brief survey of the corporate history of the parties and their dealings with respect to the subject coal gasification process is helpful to an understanding of this litigation. Koppers Co. and Krupp-Koppers had a common founder—Mr. Heinrich Koppers. In 1901, Mr. Koppers formed his own business in Essen, Germany. He later came to the United States and constructed coke oven plants for the steel industry. In 1912 he incorporated his American business as H. Koppers, Inc. About 1914–1915 he refinanced this company by selling 80% of its stock while retaining 20% ownership, moved the company to Pittsburgh, and reincorporated as Heinrich Koppers Inc. Mr. Koppers later left the United States, and during World War I his 20% ownership was confiscated by the United States government and sold at public auction. In 1944 this company was reorganized as a Delaware corporation and became known by its present corporate name, Koppers Company, Inc.

The German company founded by Mr. Koppers was incorporated in 1927 and reincorporated in 1933 as Heinrich Koppers GmbH. In 1974 Heinrich Koppers GmbH was acquired by Fried, Krupp GmbH, and in 1975 the name was changed from "Heinrich Koppers GmbH" to its present corporate name "Krupp-Koppers GmbH".

The coal gasification process which is at the center of much of this litigation was developed by Friedrich Totzek, an employee of Heinrich Koppers GmbH, in Germany during the 1930's. Shortly after World War II, the Allied Military Government published a technical description of this process and the work of Heinrich Koppers GmbH relating to it. In 1946–1947 Koppers Co. sent a number of representatives to Heinrich Koppers GmbH to receive additional information concerning this process. In 1948 Koppers Co. and Heinrich Koppers

GmbH entered into an agreement under which Heinrich Koppers GmbH assigned all of its United States patentable inventions concerning this process to Koppers Co. The agreement further provided that Koppers Co. was entitled to all of Heinrich Koppers GmbH's know-how relating to this process without restriction upon Koppers Co.'s use of such technology. This agreement terminated in 1968.

In 1948–1950 Koppers Co. and Heinrich Koppers GmbH participated in the design and construction of a demonstration coal gasification plant using this process in Louisiana, Missouri. Because of the availability of inexpensive large reserves of natural gas and of petroleum from the Middle East, the production of synthetic fuels was not commercially competitive in the United States and this plant was soon closed.

However, Heinrich Koppers GmbH and later Krupp-Koppers continued with the development and construction of commercial coal gasification plants in other parts of the world. Between 1949 and 1980 over twenty such plants were erected.

Perceiving a future need for synthetic fuels in the United States, Koppers Co. entered into a new licensing agreement with Heinrich Koppers GmbH in 1972. This agreement granted Koppers Co. a license under certain United States patents relating to the subject coal gasification process and provided for the assistance and know-how of Heinrich Koppers GmbH. This agreement was permissibly terminated by Krupp-Koppers effective December 31, 1979.

### Legal Standard

The issuance of a preliminary injunction is a matter of equity within the sound discretion of the court. The general purpose of a preliminary injunction is to preserve the status quo pending final determination of the action after a full hearing. 7 Moore's Federal Practice ¶ 65.04[1] (2d ed. 1980). *Oburn v. Shapp*, 521 F.2d 142 (3rd Cir. 1975). The parties agree the applicable legal standard requires (1) the moving party show a reasonable probability of eventu-

al success on the merits; (2) the moving party show it will be irreparably injured if the preliminary injunction is not granted; (3) the Court consider the possibility of harm to other interested persons from the grant or denial of the preliminary injunction; (4) the Court consider what effect the grant or denial of the preliminary injunction would have on the public interest. *Oburn v. Shapp, supra.* Since both parties are requesting injunctive relief this opinion will address these factors with regard to each request.

### Defendant's Use of KOPPERS

■ It is useful to begin an analysis of plaintiff's claims with respect to KOPPERS with a definition of terms. A trademark is "any word, name, symbol or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." Lanham Act § 45, 15 U.S.C.A. § 1127. A service mark is a mark "used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others." *Id.* Trade names are "individual names and surnames, firm names and trade names used by manufacturers, industrialists, merchants, agriculturists and others to identify their businesses, vocations, or occupations; ..." *Id.*

Plaintiff is the owner of nine trademark registrations and one service mark registration issued by the United States Patent and Trademark Office for KOPPERS. For present purposes the most significant of these is the service mark registration which broadly covers engineering surveys, design and consultation services, economic and market research surveys, and the construction and repair of industrial plants and apparatus in fields of manufacture, fabrication or treatment of metals, bituminous materials, gas, and chemicals. The plaintiff has extensively advertised and promoted its goods and services under the mark and name KOPPERS to the industrial trade and to the public at large in the United States.

Defendant placed an advertisement in the September 20, 1978 issue of Chemical Week (PX 132). Defendant advertised its services in the fields of coke plants, coal gasification, and others and stated: "The names KRUPP and KOPPERS have symbolized reliability during a century of technical advancement." In the December 19, 1979 issue of Chemical Week defendant advertised its coal gasification services (PX 38). These advertisements were, in part, the catalyst of this action. Apparently defendant had also advertised in other United States publications, but plaintiff was unaware of these advertisements until this litigation began. (Tr. 922).

### A. Defendant's Claimed Contract Right to Use KOPPERS

In the late 1960's plaintiff and defendant began to experience problems regarding their concurrent use of KOPPERS outside of the United States as both companies grew and expanded their international activities. Defendant contends the parties reached, at least through their conduct, a world-wide agreement respecting their concurrent use of KOPPERS and that plaintiff is thereby estopped from asserting defendant's use of KRUPP–KOPPERS in the United States is wrongful. Plaintiff contends there was never any such world-wide agreement and that the parties engaged in a country-by-country confrontation and resolution of this problem. The record supports plaintiff's contention that the parties never reached any such world-wide agreement. In 1969 Koppers Co. sought the consent of Heinrich Koppers GmbH to its registration of KOPPERS in the Netherlands for certain chemical products. Heinrich Koppers GmbH consented, but with an agreement from Koppers Co. assuring Heinrich Koppers GmbH's right to KOPPERS in the Netherlands in other respects. In 1970 Koppers Co. sought the permission of Heinrich Koppers GmbH to use the name EICK-HOFF–KOPPERS in Germany for a company in which Koppers Co. had a 50% interest. Heinrich Koppers GmbH objected to the use of the proposed name on the ground it would impair Heinrich Koppers GmbH's rights in KOPPERS. Koppers Co. accepted

Heinrich Koppers GmbH's objection and named the company EICKHOFF–UNIVERSAL instead. In 1971 Koppers Co. and Heinrich Koppers GmbH had a similar confrontation in Japan and reached an agreement on the concurring use of KOPPERS in Japan. In 1970–71 Koppers Co. and Heinrich Koppers GmbH could not reach agreement with respect to the use of KOPPERS in Australia; Koppers Co. opposed Heinrich Koppers GmbH's registration of KOPPERS and successfully litigated the matter. In 1971 Heinrich Koppers GmbH protested the use of the name MADISON KOPPERS in France by a licensee of Koppers Co. Koppers Co. caused its licensee to discontinue use of KOPPERS. In 1975 Krupp–Koppers sought the permission of Koppers Co. to use the name KOPPERS PROJECTOS INDUSTRIAS LTDA. for a Brazilian subsidiary; Koppers Co. did not object. Moreover, in 1973 Koppers Co. submitted to Heinrich Koppers GmbH a proposed agreement for the world-wide use of KOPPERS. This proposal was never acted upon by Heinrich Koppers GmbH or Krupp-Koppers. Memoranda from Krupp-Koppers' own files expressly states that the parties never reached a world-wide agreement. (PX 33, PX 82A). Further, in 1975, 1977, and 1978 Koppers Co. objected to possible use of KOPPERS in the United States by Krupp-Koppers.

B. *Plaintiff's Claim of Statutory Trademark Infringement*

The plaintiff relies, in part, on the traditional law of trademark infringement set forth in section 32(1) of the Lanham Act, 15 U.S.C.A. § 1114(1):

> Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such *use is likely to cause confusion, or to cause mistake, or to deceive*; ... shall be liable in a civil action by the registrant for the remedies hereinafter provided. (Emphasis added)

Here, defendant's use of KRUPP–KOPPERS (a) is without the consent of the registrant (the plaintiff); (b) is in commerce; (c) is a "colorable imitation" of the registered mark KOPPERS, incorporating the precise term KOPPERS as a prominent feature. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331 (2nd Cir. 1975) (GROTRIAN–STEINWEG infringes STEINWAY); (d) is used in connection with the sale, offering for sale, distribution, or advertising of services. The controversy centers on whether such use is likely to cause confusion, or to cause mistake, or to deceive.

Plaintiff strenuously argues there is a likelihood of confusion in the concurrent use of KOPPERS and KRUPP–KOPPERS by the parties in the United States in connection with directly competitive services. Plaintiff argues that it is the first comer in the United States and defendant, as the second comer, has a duty to name its services to avoid confusion. Plaintiff asserts that the addition of KRUPP to KOPPERS does not cure the wrong but rather only aggravates the wrong in that plaintiff may be thought to be engaged in a joint venture with Fried, Krupp GmbH or with defendant or to have some corporate relationship to Fried, Krupp GmbH or to defendant. Plaintiff is especially concerned with the negative connotations radiating from the association of KRUPP with armaments and from the Iranian ownership of a substantial interest in Fried, Krupp GmbH. Plaintiff argues that neither the expense of the services involved nor the alleged sophistication of the marketplace will prevent confusion.

Defendant, on the other hand, contends the concurrent use of KOPPERS by the parties in the United States does not give rise to a likelihood of confusion. The defendant rests this conclusion on an evaluation of the following seven factors set forth in *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, supra.*[3]

---

3. These factors are substantially similar to those that have been identified in this Circuit:

degree of similarity between the marks, intent of the actor in adopting the mark, relation in

a) The strength of the registrant's mark: defendant contends since KOPPERS is derived from a surname it is an inherently weak mark and cannot be afforded much protection; defendant further contends plaintiff's assertion that KOPPERS–TOTZEK is generic vitiates plaintiff's claim that KOPPERS is a strong mark deserving of protection.

b) The alleged infringer's purpose: defendant argues that its purpose in using KOPPERS is to trade on the reputation and good will built up by Heinrich Koppers GmbH and that it does not intend to "palm off" its services as those of the plaintiff.

c) The degree of similarity between the marks: defendant urges that the marks are dissimilar because KRUPP–KOPPERS is a composite mark with KRUPP in the predominate position.

d) The degree of similarity between the products: defendant concedes that both parties are offering substantially the same services.

e) The competitive proximity of the products: defendant focuses on the field of coal gasification and notes that defendant has erected over 20 commercial coal gasification plants and plaintiff has never built a commercial coal gasification plant. Thus, defendant argues that competitive proximity, at least in the field of coal gasification, is spéculative.

f) Actual confusion: defendant contends the evidence of actual confusion is not substantial.

g) The degree of care likely to be exercised by consumers: again defendant focuses only on the field of coal gasification and argues that coal gasification is offered to a sophisticated market and that the enormous costs involved (approximately one billion dollars for a coal gasification plant and 200–300 million dollars for the coal gasification process itself) would insure the utmost care in the marketplace.

use and manner of marketing between the goods and services, and degree of care likely to be exercised by purchasers. *Sears, Roebuck*

■ The test of trademark infringement is likelihood of confusion, not actual confusion. 3 Callman, Unfair Competition, Trademarks, and Monopolies § 80.6 at 558 (3d ed. 1969). The courts recognize that reliable proof of actual confusion is almost always impossible to secure. *Harold F. Ritchie, Inc. v. Chesebrough-Ponds, Inc.*, 281 F.2d 755, 761 (2nd Cir. 1960). Although defendant's use of KOPPERS in the United States has so far been quite limited, two recent magazine articles do illustrate actual confusion. The August 28, 1980 issue of Energy News Record contained an article on a Tennessee Valley Authority ("TVA") report on synthetic fuels; although the TVA had decided to employ the services of the defendant, the article describes the systems being considered as those "developed by Texaco, Inc. and Koppers Co., Inc." (PX 123) The August 27, 1980 Chemical Week article dealing with the same TVA report erroneously stated "Texeco [sic] and Koppers coal gasification methods are judged to be best." (PX 124) Readers of these trade publications could hardly fail to confuse the identity and activities of plaintiff and defendant.

Defendant argues that since KOPPERS is derived from a surname, it is an inherently weak mark and cannot be afforded much protection. *Scott Paper Co. v. Scott's Liquid Gold*, 589 F.2d 1225 (3rd Cir. 1978), *Sutton Cosmetics (P.R.), Inc. v. Lander Co., Inc.*, 455 F.2d 285, 289 (2nd Cir. 1972). The plaintiff responds that KOPPERS is not a common surname and that through extensive use has acquired secondary meaning and become entitled to the protection of a strong mark. *Id., Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167 (2nd Cir. 1976). This Court finds that plaintiff has a reasonable probability of success of proving that through extensive use KOPPERS possessed secondary meaning at the time defendant commenced use of KRUPP–KOPPERS in the United States and KOPPERS is therefore entitled to protection against infringement.

*and Co. v. Johnson*, 219 F.2d 590, 592 (3rd Cir. 1955).

Defendant also asserts that its purpose in using KOPPERS is based upon a good faith desire to trade on the reputation and good will of its corporate predecessor, Heinrich Koppers GmbH. Plaintiff has offered no evidence to suggest that defendant's purpose is otherwise. However, good faith is not an absolute defense to a statutory infringement action, *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245 (4th Cir.), *cert. denied*, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 245 (1970), and as defendant notes, is merely one factor among many to be considered by the court in determining whether there is a likelihood of confusion. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, supra.* As the court noted in *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 382 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976), even though there is no evidence of bad faith the late comer has a responsibility to avoid confusion.

While defendant asserts KRUPP–KOPPERS is distinctively different from KOPPERS, plaintiff urges that evidence of actual confusion, discussed above, as well as erroneous references by counsel, witnesses, and this Court during these proceedings indicate the great degree of similarity. Visual and auditory similarity support a finding that KRUPP–KOPPERS is sufficiently similar to KOPPERS to contribute to a likelihood of confusion.

Defendant, as mentioned above, contends that an evaluation of other factors—competitive proximity of the products, actual confusion, and degree of care likely to be exercised by consumers—all support a finding of no likelihood of confusion. Evaluation of these three factors, and to some extent the degree of similarity between the marks, discussed immediately above, has a common characteristic, *i. e.*, the answer given depends on the question asked. If the Court views these factors with a rather restricted scope and looks only to coal gasification plants costing a billion dollars and coal gasification processes costing hundreds of millions of dollars and those who would purchase these products and services, there is a possibility of evaluating these factors and finding no likelihood of confusion. However, if the Court views the entire range of services offered by the parties, and takes a less restrictive view of the market and its workings, there is a greater possibility that an evaluation of the same factors would lead to a finding of a likelihood of confusion. Given the facts and circumstances present in the matter *sub judice*, this Court finds it appropriate to adopt a less restrictive view.

The infringement section of the Lanham Act formerly required that there be a likelihood of confusion of "purchasers as to the source of origin of such goods or services" (formerly codified at 15 U.S.C.A. § 1114(1)). The 1962 amendment deleting this language shows a clear congressional intent to "outlaw the use of trademarks which are likely to cause confusion, mistake, or deception of any kind, not merely of purchasers nor simply as to source of origin." *Syntex Laboratories, Inc. v. Norwich Parmacal Co.*, 437 F.2d 566, 568 (2nd Cir. 1971). Clearly the likelihood of confusion cannot be considered in a vacuum, but must be determined with respect to certain persons. The amendment shows congressional intent that the persons should not be restricted to purchasers. The amendment also shows such intent that the nature of the confusion should not be restricted to the source of origin of goods or services. Thus, this Court infers that it must broadly define the nature of the forbidden confusion and the class of people whose confusion is forbidden.

Even before the 1962 amendment Judge Learned Hand deemed the potential confusion of nonpurchasers to be legally material. In *G. H. Mumm Champagne v. Eastern Wine Corp.*, 142 F.2d 499 (2nd Cir.), *cert. denied*, 323 U.S. 715, 65 S.Ct. 41, 89 L.Ed. 575 (1944), he found defendant's deceptively labeled champagne could be substituted for plaintiff's champagne and mislead nonpurchasers. In *Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc.*, 221 F.2d 464 (2nd Cir.), *cert. denied*, 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955), *reh. denied*, 350 U.S. 897, 76 S.Ct. 149, 100 L.Ed. 789 (1955), the purchas-

ers of defendant's cheap imitation of plaintiff's distinctive clock knew exactly what they were buying. But the court regarded it as wrongful that guests in the homes of those purchasers might be led to believe that the imitation displayed by their host was, in fact, the prestigious timepiece. Although the findings cited above were made under theories of unfair competition, they certainly were part of the legal context in which Congress acted in adopting the 1962 amendment. In a post–1962 amendment case, *Communications Satellite Corp. v. Comcet, Inc., supra,* the court found a likelihood of confusion at customer levels and among investors on the stock market. Although the decision was reached under a theory of common law trademark infringement, it is certainly instructive to this Court's consideration of the matter *sub judice.* In *AMP Inc. v. Foy,* 540 F.2d 1181, 1183 (4th Cir. 1976) the court stated:

> We remand because we hold that the district court used too restrictive a standard [likelihood of confusion of plaintiff's customers]. The test is not only the danger that defendant's use of the term "Amp" will confuse plaintiff's customers, but the likelihood of danger that such use will confuse *the public in general,* including *plaintiff's customers, defendant's customers* and *other members of the public.* (emphasis added).

The nature of the forbidden confusion has also been broadly defined in recent cases. Courts have increasingly come to recognize that damaging misassociation of commercial identities can occur at subliminal levels. In *Ortho Pharmaceutical Corp. v. American Cyanamid Co.,* 361 F.Supp. 1032 (D.N.J.1973) no likelihood of confusion as to source or sponsorship of products was found; nevertheless, injunctive relief was premised upon the conclusion that

> . . . this is a case in which confusion or deception occurs on a subliminal or subconscious level, causing the consumer to identify the properties and reputation of one product with those of another, although he can identify the particular manufacturer of each. The trade-mark laws protect against this kind of psycho-

logical confusion implanted by similar trademarks in the mind of a consumer. *Id.* at 1044.

Similarly, in the *Steinway* case, 523 F.2d at 1341, 1342, the court concluded that the purchasers would distinguish between the manufacturers of the pianos, but that subliminally an association between the manufacturers would be assumed because of their similar names. And, in *Londontown Mfg. Co. v. Cable Raincoat Co.,* 371 F.Supp. 1114 (S.D.N.Y.1974) the court focused upon subliminal confusion in granting relief. Further, securing the initial business contact by the defendant because of an assumed association between the parties is wrongful even though the mistake is later rectified. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, supra*; 3 Callman, Unfair Competition, Trademarks, and Monopolies, § 80.6, at 565 (3rd ed. 1969).

Plaintiff is listed on the New York Stock Exchange; plaintiff directs advertising to the public at large. The evidence of actual confusion in two trade magazines has been discussed above. Witnesses for both parties testified that inquiries from potential customers had been received about the nature of parties' relationship (Tr. 116–17, 548, 551). This Court finds that the plaintiff has a reasonable probability of success on the merits of its claim that concurrent use of KOPPERS by the parties in the United States produces a likelihood that investors in the plaintiff, the market to which plaintiff's advertising is directed, potential customers of the plaintiff, and others will be confused, if only subliminally, and that the defendant will secure wrongful initial business contacts because of its use of KOPPERS. The Court also finds that some purchasers of the plaintiff's goods or services will be confused by the combined name KRUPP–KOPPERS, and will think the plaintiff has associated itself with KRUPP interests, and will consequently avoid purchasing from the plaintiff. It is plain that some people in this country still associate the KRUPP name with the KRUPP war crimes of World War II and with its role in

arming Hitler's forces. The confusion and resulting effects upon the plaintiff's business would not be confined to products and services sold to sophisticated purchasers. They would infect all of the plaintiff's business including its access to capital markets. Moreover, Iranian ownership of a substantial interest in defendant's corporate parent could have a similar negative impact.

Assuming arguendo that this Court accepts the defendant's perspective and evaluates the likelihood of confusion factors only in respect to the sophisticated expensive marketplace of coal gasification, this Court still finds that there is a reasonable probability of plaintiff proving a likelihood of confusion. There is substantial case law to indicate that even those who deal in the most sophisticated expensive marketplace may be led astray. In *Morgenstern Chemical Co. v. G. D. Searle & Co.*, 253 F.2d 390 (3rd Cir.), *cert. denied*, 358 U.S. 816, 79 S.Ct. 25, 3 L.Ed.2d 58 (1958) the court was faced with "MICTINE" and "MICTURIN" for drugs dispensed only on a physician's prescription. Finding a likelihood of confusion, the court wrote "[w]hile it is doubtless true" that physicians and pharmacists are highly trained and knowledgeable about drugs, they "are human and in connection with the rest of mankind are subject to human frailties." *Id.* at 393–394. In *Carlisle Chemical Works, Inc. v. Hardman & Holden Ltd.*, 434 F.2d 1403 (C.C.P.A.1970) the parties used similar marks "COZIRC" and "ZIRCO" in the sale of specialized chemicals to paint and ink manufacturers. Even though sales were made through technically trained purchasing agents, the court held that there would be a likelihood of confusion. In *Technic, Inc. v. Sel-Rex Corp.*, 419 F.2d 1331 (C.C.P.A.1970), the court held that there was a likelihood of confusion between the marks "RHODIUM X–LESS" and "RODEX" for electroplating solutions even though the defendant claimed that the customers of the parties, industrial chemists, "are the most discriminating class of buyers imaginable." In *Wincharger Corp. v. Rinco, Inc.*, 297 F.2d 261 (C.C.P.A.1962) one party dealt in precision electronic instruments under the mark

"RINCO" and the other dealt in motors, generators, and related products under the mark "WINCO". The Court stated:

It is true that in most instances technicians would use the products of either party and they are a discriminating group of people but that does not eliminate the likelihood of purchaser confusion here. Being skilled in their own art does not necessarily preclude their mistaking one trademark for another when the marks are as similar as those here in issue, and cover merchandise in the same general field. *Id.* at 264.

In *Communications Satellite Corp. v. Comcet, Inc., supra.* The plaintiff used the mark "COMSAT" in connection with its communication services through the use of satellites in space. The defendant used the mark "COMCET" in connection with communications computers. Although the goods and services were expensive and the customers sophisticated, the Court found that confusion was likely. In *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, supra*, the Court found a likelihood of confusion between the marks "STEINWAY" and "GROTRIAN–STEINWEG" used for pianos, although the pianos were expensive and were purchased by sophisticated customers.

## C. *Defendant's Equitable Defenses*

Defendant contends plaintiff's likelihood of success on the merits of its claim respecting defendant's use of KOPPERS is substantially lessened when defendant's equitable defenses are considered. Defendant claims plaintiff has permitted defendant to use KOPPERS in the United States over a long period and is thereby guilty of laches. Defendant claims plaintiff has acquiesced in its use of KOPPERS in the United States and that plaintiff has fostered an imaginative ambiguity in respect to the relationship between the parties and is thereby estopped from seeking injunctive relief.

Plaintiff refutes these defenses. Plaintiff contends it promptly voiced objection to defendant's use of KOPPERS in the United States, it did not unreasonably delay the

assertion of its rights, and if there were a delay, there was no prejudice to defendant. Plaintiff contends it did not acquiesce in defendant's use of KOPPERS in the United States and it sought to maintain a distinction between the parties.

■ This Court has already found that there is convincing evidence that the parties did not reach any world-wide agreement on the concurrent use of KOPPERS. It now finds there is insufficient evidence of record to support a finding that plaintiff acquiesced in defendant's use of KOPPERS in the United States. The record is replete with references to plaintiff's prompt objection to defendant's proposed use of KOPPERS in the United States. While defendant charges plaintiff with imaginative ambiguity, the record merely shows the parties working hand in hand to fulfill their mutual expectations under their various licensing agreements. Thus, this Court finds defendant's proffered defenses of laches, acquiescence, and estoppel to be unsubstantiated by the record.

### D. *Plaintiff's Claim of Unfair Competition*

In addition to the traditional law of trademark infringement discussed above, the plaintiff relies on section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a) and common law principles of unfair competition. Section 43(a) provides:

> any person who shall ... use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Plaintiff cites *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 649 (3rd Cir. 1958) for the proposition that a violation of that section requires only a "tendency to deceive". (Plaintiff's proposed Conclusion of Law 14). Plaintiff further contends that by its long and extensive use of KOPPERS it has acquired rights of protection under common law principles. Plaintiff cites *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976) for the proposition that unlawful conduct at common law may be found even if it is concluded that confusion is unlikely. (Plaintiff's proposed Conclusion of Law 15). Thus, plaintiff relies on section 43(a) and common law unfair competition as an alternative basis for relief and apparently urges that the appropriate legal standard is different from and less stringent than the likelihood of confusion that is required by traditional trademark infringement law.

Defendant apparently contends section 43(a) and unfair competition at common law apply the same likelihood of confusion standard as traditional trademark infringement law. (Defendant's Post-Hearing Brief pp. 58–59). Since the plaintiff has not pursued this basis for relief with vigor,[4] and in view of this Court's finding that plaintiff has a reasonable probability of proving a likelihood of confusion under traditional trademark infringement law, this Court finds it unnecessary and inappropriate to express an opinion on the appropriate legal standard under section 43(a) and common law unfair competition.

### E. *Plaintiff's Claim of Statutory Incontestability*

Plaintiff advances two other arguments in support of its motion for a preliminary injunction. It claims, first, that its right to the exclusive use of its registered service mark and trademarks within the United States is incontestable under 15 U.S.C.A. §§ 1065, 1115(b), and that its proof of com-

---

4. Plaintiff's Memorandum of Law in Support of Motion for a Preliminary Injunction pp. 41–42: "On this motion and at this time we will not burden the Court with an analysis of precedents dealing with the above theories inasmuch as they generally apply the same principles in the protection of trademarks—apart from registration—as are applied where reliance is on the registration of a mark."

pliance with the registration and affidavit provisions of those sections is conclusive proof of that right. It also claims that defendant is subject to preliminary injunction under the anti-dilution statutes of various states. This Court's disposition of the principal infringement claims under 15 U.S.C.A. § 1114(1) makes it unnecessary to resolve these claims as grounds for a preliminary injunction. Yet these claims may become essential to the parties in future proceedings in this case. Therefore this Court concludes that a preliminary discussion of these claims may aid in the efficient administration of justice.

The incontestability provision, 15 U.S.C.A. § 1115(b) declares:

> (b) If the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the affidavit filed under the provisions of said section 1065 subject to any conditions or limitations stated therein except when one of the following defenses or defects is established: . . .

> (4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party, or their geographic origin; or

> (5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to registration of the mark under this chapter or publication of the registered mark under subsection (c) of section 1062 of this title: Provided, however, That this defense or defect shall apply only for the area in which such continuous prior use is proved; or

> (6) That the mark whose use is charged as an infringement was registered and used prior to the registration under this chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: Provided, however, That this defense or defect shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark. . . .

Plaintiff has proved that it has complied with section 1065 and that its marks are therefore incontestable under section 1115(b). Defendant has not claimed or proved that any of the express defenses or defects listed in section 1115(b) applies. Instead defendant claims that it has not infringed the marks of plaintiff, and that plaintiff is in any event barred from any relief by laches, acquiescence, or estoppel.

■ Some courts have held that the incontestability provision is purely defensive, and that it creates no new substantive rights. E. g. *Wrist-Rocket Mfg. Co. v. Saunders Archery Co.*, 516 F.2d 846, (8th Cir. 1975); *Tillamook County Cream. Ass'n v. Tillamook Cheese and Dairy Ass'n*, 345 F.2d 158 (9th Cir.) (dictum), *cert. denied*, 382 U.S. 903, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965); *Haviland & Co. v. Johann Haviland China Corp.*, 269 F.Supp. 928 (S.D.N.Y. 1967). Other courts disagree, emphasizing the "conclusive evidence of . . . exclusive right" language. E. g. *Union Carbide Corp. v. Ever-Ready, Inc.*, *supra*. Defendant's claims in this case make it unnecessary for this Court to resolve this controversy. The defense of non-infringement is not affected by section 1115(b) as a matter of law. While there is some disagreement whether section 1115(b) precludes the defenses of waiver, acquiescence and estoppel—compare, e. g. *Haviland & Co. v. Johann Haviland China Corp.*, *supra*, with *Apple Growers Ass'n v. Pelletti Fruit Co.*, 153 F.Supp. 948 (D.Cal.1957) and *Union Carbide Corp. v. Ever-Ready, Inc.*, *supra* (dictum)—in this

case defendant has not proved facts which would establish those defenses.

### F. Plaintiff's Claim of Dilution

■ Plaintiff's claim that defendant is subject to injunction under the anti-dilution statutes of various states is faintly pleaded and ill-proved. Plaintiff has called this Court's attention to anti-dilution statutes from twenty states. Most resemble the New York statute which declares:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services. N.Y. General Business Law § 368-d (1968).

The legal theory of this claim is adequate, and this Court has jurisdiction of this claim. However, plaintiff is not entitled to a preliminary injunction based on this claim. Plaintiff has produced evidence of three kinds of actions by the defendant in the United States which bear on the anti-dilution claim. Defendant advertised in the trade journal Chemical Week, it sent letters to ten potential contractors for a TVA coal gasification project, and it operated an office of some sort in Harrison, New York.

With respect to the advertisements, plaintiff offered no evidence concerning the circulation, the advertising policies, or the business location of Chemical Week. Whether judicial notice is appropriate as to any of these matters is a matter of profound doubt. Assuming it is appropriate, this Court would have to infer that Chemical Week is a journal of limited circulation, printed in a single batch without the possibility of inserting different advertisements in different parts of the country. This Court would also have to infer that Chemical Week is in fact circulated in virtually all of the states which have anti-dilution statutes. These inferences would raise the legal question whether advertisements in

such a magazine, without more, can violate the anti-dilution laws of the various states. This Court believes that this legal question poses a constitutional question of the limits of state power under the Commerce Clause. A rule which enables a state to stifle advertising in national publications in pursuit of local regulation of business conduct might reach too far if the advertisement is the defendant's only contact with the state. It is surely far from clear that this kind of contact with a state could form the basis for personal jurisdiction of the state's courts or for the collection of the state's taxes. See, e. g. Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed.2d 95 (1945); National Bellas Hess, Inc. v. Dep't of Revenue, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967). It is also far from clear that such an advertisement standing alone could justify the assertion of state power to enjoin the defendant. However, this Court need not, and therefore should not resolve these questions at this time. The issuance of the preliminary injunction on the grounds of infringement serves to fully protect the plaintiff's rights pending trial on the merits.

The second kind of conduct by the defendant which bears on the anti-dilution claim is the letter which the defendant sent to ten potential TVA contractors aimed at soliciting inquiries which could lead to eventual business relations. The letter declared that the license agreement between the plaintiff and the defendant would soon end, that the defendant owned the subject coal gasification process; and that its "license activities in the U.S. and Canada [would] be taken care of by our Manager Business Development Coal and Gas in the United States..." (PX 36) This letter was sent to contractors in California, Colorado, New Jersey, New York, Ohio, Pennsylvania, and Texas. Of these states, it appears that only california and New York have anti-dilution statutes. The sending of the letter is in some sense a more direct and purposeful contact with the state than is an advertisement in a national magazine. It involves the use of the name KRUPP–KOPPERS

which may infringe the registered KOP-PERS marks. But the claim of dilution is distinct from the claim of infringement. The anti-dilution statutes protect a plaintiff's business from the erosion of its name in the consciousness of the public or in some material group of people. It also protects a plaintiff's business from the appropriation of its good will; such appropriation may occur if another company uses a similar name in a way which may lead customers to do business with it because of a supposed connection with the plaintiff. 3 Callman, Unfair Competition, Trademarks, and Monopolies § 84.2 at 953 (3d ed. 1969).

Defendant claims that anti-dilution laws are given limited application because they go far toward stifling free competition. Defendant cites cases for the proposition that the anti-dilution laws, or at least the New York statute, have no application in suits between competitors. *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 399 N.Y.S.2d 628, 42 N.Y.2d 538, 369 N.E.2d 1162 (1977); *Filter Dynamics, Inc. v. Astron Battery*, 19 Ill.App.3d 299, 311 N.E.2d 386 (1974). Defendant also cites authorities for the limiting propositions that such statutes only protect extremely strong marks, not surnames, and that they only protect against dilution by a business offering "a product with a similar name that is of poor quality and cheaper. [sic]" *Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288, 1295 (S.D.N.Y.1972) (dictum).

There may be some element of truth to these points, but this Court need not rest its judgment on them for several reasons. First, the issuance of a preliminary injunction on infringement grounds ends the present risk of dilution of the KOPPERS mark. Second, defendant's sending of four letters into California and one into New York is a very modest contact with the state. Whether it is sufficient to justify the exercise of state power to enjoin dilution remains a debatable question. The established federal policy of avoiding the needless decision of a constitutional question counsels against decision of this claim at this time. Third, the five letters were addressed to major contractors. The ad-dressees are the people most likely to know of the distinct identity of the parties to this case. The prospect of actionable harm flowing from a strictly private approach to a customer who is very likely to know of the separate identities and operations of the parties is remote. The letters simply have not been shown to have a probable tendency to harm the plaintiff by diluting its mark.

Plaintiff has proved the existence of a New York office of the defendant. The proof was made in passing, and without any express reliance on it as a basis of its dilution claim. The letters which the defendant sent to the contractors referred them to defendant's "Manager Business Development Coal and Gas in the United States: Dr. Bruno Beck [,] Krupp International, Inc. 550 Mamaroneck Avenue, Harrison, N.Y. 10528." (PX 36). The operation of a business office in a state is plainly a sufficient contact to allow the state to control the defendant's business operations which touch the state. Thus both the New York letter and the officer operation are within the constitutional reach of New York's anti-dilution statute. But this does not decide the claim on the merits, it only opens the door to a decision. Plaintiff's proofs concerning the letter and concerning the character and extent of the office operation fall far short of establishing its probable success on the merits of this claim. Therefore plaintiff is not entitled to preliminary injunctive relief on its dilution theory.

### G. The Additional Requisites for Injunctive Relief

Plaintiff has established a reasonable probability of success on the merits of its statutory infringement claim. Thus, the Court must now consider the three other requisites for injunctive relief.

Injunctive relief requires the moving party show it will be irreparably injured if the preliminary injunction is not granted. *Oburn v. Shapp, supra.* A finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears. *Tefal, S. A. v. Products*

*International Co.*, 186 U.S.P.Q. 545 (D.N.J. 1975), *aff'd*, 529 F.2d 495 (3rd Cir. 1976). This injury arises both from the potential difficulty of proof of plaintiff's damages, *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2nd Cir. 1971); *Franklin Mint Inc. v. Franklin Mint, Ltd.*, 331 F.Supp. 827, 830 (E.D.Pa.1971), and also from the impairment of intangible values such as the strength of plaintiff's mark and its reputation and good will. *Louis Rich, Inc. v. Horace W. Longacre, Inc.*, 423 F.Supp. 1327, 1335 (E.D.Pa.1976); *Chips 'N Twigs, Inc. v. Blue Jeans Corp.*, 146 F.Supp. 246, 248 (E.D.Pa.1956). Noting the defendant's limited use of KOPPERS in the United States to date, and recognizing the threatened impairment to the strength of plaintiff's mark, reputation, and good will, this Court finds that plaintiff has established this prerequisite for injunctive relief.

This Court must also consider the possibility of harm to defendant from the grant of a preliminary injunction. *Oburn v. Shapp, supra.* Defendant argues it is the only company to use the mark and name KOPPERS that has ever built a commercial plant using the subject coal gasification process. Thus defendant argues if it is forced to adopt a different name in the United States, plaintiff would be the beneficiary of defendant's reputation and good will with respect to this coal gasification technology.

Defendant seems to argue that because it has built up its reputation and good will through its construction of commercial plants using the subject coal gasification process outside of the United States, it is entitled to trade on that reputation and good will in the United States notwithstanding any protection to which plaintiff has proven itself entitled. This would leave plaintiff in the untenable position of having proven itself entitled to protection, but unable to receive relief. Defendant's argument also appears to rest on the unsubstantiated contention that plaintiff would attempt to trade on defendant's achievements.

Further, the record indicates that defendant knowingly placed itself in a position of jeopardy when it began to use KRUPP–KOPPERS in the United States. Defendant commenced use of KRUPP–KOPPERS in the United States with full knowledge of plaintiff's registration of KOPPERS and will full knowledge of the extensive past controversies concerning the names of the parties in other countries. The chief patent counsel of defendant's corporate parent, who had a detailed knowledge of American law, had given defendant a "lump sum negative evaluation" when consulted with respect to defendant's use of KRUPP–KOPPERS in the United States. (PX 31A). This Court finds that the protection to which the plaintiff is entitled outweighs any harm defendant may suffer from the grant of a preliminary injunction.

Finally, the Court is directed to consider what effect the grant or denial of a preliminary injunction would have on the public interest. *Oburn v. Shapp, supra.* The grant of a preliminary injunction will protect plaintiff's competitive position. There is no evidence of record to indicate that the grant of an injunction would deter defendant from entering the United States market; to the contrary, the record indicates a flexibility in corporate name usage in different countries. Thus, the public interest in a competitive marketplace will be furthered by the grant of a preliminary injunction.

### TVA Letter

In October, 1979, the Tennessee Valley Authority ("TVA") solicited proposals from ten contractors for the construction of a demonstration coal gasification plant. The TVA designated the subject coal gasification process for comparison with one of two other processes for use in the project. In the latter part of 1979, six of the ten TVA contractors sought the assistance of Koppers Co. in preparing their proposals with respect to the coal gasification portion of the project.

In November, 1979, Koppers Co. had notified Krupp-Koppers that Koppers Co. in-

tended to offer coal gasification services on the TVA project; Krupp-Koppers responded that Koppers Co. should not submit information to the TVA contractors and that Krupp-Koppers would deal directly with them. On December 3, 1979, Krupp-Koppers wrote to the TVA and to each of the ten contractors informing them that it was "the owner" of the subject coal gasification process and that its license to Koppers Co. relating to the process would expire on December 31, 1979. (PX 36)

The TVA narrowed the list of prospective contractors to three; of these three, two were among the six which had previously contacted Koppers Co. Those two companies contacted Koppers Co. concerning Krupp-Koppers' December 3, 1979 letter. Although Koppers Co. assured the two companies that it was still in a position to provide coal gasification services, Koppers Co. was not subsequently contacted by these companies with respect to the TVA project. The TVA turned to Krupp-Koppers for coal gasification services in connection with the proposed plant.

Plaintiff acknowledges that the 1972 licensing agreement between the parties was to terminate December 31, 1979. However, plaintiff contends that under the 1972 agreement it was not the licensee of the subject coal gasification process, but rather was the licensee of only certain technology concerning the process and that the process itself was in the public domain. Plaintiff contends that defendant could have announced the termination of the 1972 license as long as it specified that the license pertained only to certain technology. Plaintiff argues that the December 3, 1979 letter as sent was a thinly veiled warning that doing coal gasification business with plaintiff would subject a contractor to claims of patent infringement or unauthorized use of proprietary information. Plaintiff further argues that defendant intended to interrupt negotiations and prevent consummation of any contract between plaintiff and the TVA or the TVA contractors and that defendant succeeded in gaining that business for itself. Plaintiff contends that these actions by defendant constitute a tortious in-terference with plaintiff's advantageous business relations. Defendant denies that plaintiff has made out a prima facie case.

■ The parties are in accord that the applicable legal standard in Pennsylvania has been set forth in *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895 (1971) which relies upon the Restatement of Torts § 766. *Glenn v. Point Park College, supra*, was the first Pennsylvania decision to recognize a cause of action for tortious interference with prospective contractual relations. A prima facie case requires a prospective contractual relation between a third party and the plaintiff, the purpose or intent to harm the plaintiff by preventing the relationship from occurring, the absence of privilege or justification on the part of the defendant, and the occurrence of actual harm or damage to the plaintiff as a result of the defendant's conduct. Both parties also suggest that the Pennsylvania courts would supplement the above analysis with a § 766B of the Restatement (Second) of Torts (1979). See *Alder, Barish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175, *cert. denied*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979).

■ Since six of the TVA contractors initially sought the assistance of plaintiff in preparing their proposals, this Court finds plaintiff has a reasonable probability of establishing that there was a legally protectable relationship between plaintiff and the TVA and the TVA contractors. Upon careful consideration of the communications between the parties culminating in the December 3, 1979 letter and plaintiff's testimony in respect to the message conveyed by this letter (Tr. 241–250), this Court finds plaintiff has a reasonable probability of proving that defendant's letter was intended to interrupt negotiations and prevent the consummation of any contract between plaintiff and the TVA or the TVA contractors. A determination of whether defendant's December 3, 1979 letter was improper or whether it was privileged or justified turns largely on whether the subject coal gasification process was in the public do-

main. Plaintiff has introduced evidence to the effect that a large body of information regarding the subject process was available to plaintiff: the publication of technical information regarding the process by the Allied Military Government shortly after World War II; representatives of the plaintiff visited Heinrich Koppers GmbH in Germany in 1946–1947; a 1948 licensing agreement under which Heinrich Koppers GmbH assigned patentable inventions to plaintiff and agreed to supply technological information to plaintiff; plaintiff's involvement in the Louisiana, Missouri plant; an engineer of plaintiff assisted Heinrich Koppers GmbH at the latter's coal gasification plant in Finland. Since this Court is now considering plaintiff's request for preliminary injunctive relief, plaintiff must only show a likelihood of success on the merits of its claim of tortious interference and it is unnecessary to determine the exact state of the plaintiff's knowledge or capabilities. It is sufficient to state that this Court finds that plaintiff has a reasonable probability of proving that defendant's representations of ownership in the December 3, 1979 letter were different in kind from a representation such as "our tires" and broader in scope than necessary to apprise third parties of the termination of the 1972 licensing agreement. Thus, defendant's December 3, 1979 letter goes beyond proper competitive means. Restatement (Second) of Torts (1979) § 768(1)(b). However, plaintiff has failed to show either the occurrence of actual harm or damage or that defendant's action was the proximate cause of any such harm or damage. In response to the defendant's December 3, 1979 letter, plaintiff sent its own letter to the TVA contractors stating that coal gasification services were still available from plaintiff; plaintiff could specify no other projects from which it was foreclosed as a result of defendant's letter (Tr. 274). Given the state of the record, it would be mere speculation for this Court to attempt to determine if the TVA contractors decided not to deal with plaintiff because of the probable negative import of the December 3, 1979 letter. Thus, plaintiff has failed to show a reasonable probability of success on the merits of its tortious interference claim.

Plaintiff, in seeking to enjoin the defendant from tortious interference with its prospective contractual relations, must also show that it will be irreparably injured if the preliminary injunction is not granted. *Oburn v. Shapp, supra.* Although plaintiff has attempted to show a repetition of defendant's broad assertions of ownership through evidence of a statement included in an agreement between defendant and the TVA and through a statement in an article in the April 21, 1980 issue of Business Week, this Court does not believe that this evidence, i. e., a final agreement which could not interfere with the plaintiff's prospective contractual relationships and a magazine article not necessarily within the defendant's control, justifies the grant of extraordinary relief.

### The Use of KOPPERS–TOTZEK

The defendant has counterclaimed to enjoin the plaintiff from infringing its alleged common law right to the marks KOPPERS–TOTZEK and K–T (hereinafter jointly referred to as the K–T marks). The plaintiff denies the defendant owns such a right.

Neither party claims the protection of a federal or of a state registration for the K–T marks. If Krupp-Koppers has protected rights, they rest on common law principles. Common law trademark protection rests on priority of use in the relevant territory. Prior use of a mark in other countries creates no right to common law protection. *Cf. Ingenohl v. Olsen & Co.,* 273 U.S. 541, 47 S.Ct. 451, 71 L.Ed. 762 (1927). Krupp-Koppers must therefore show (1) a use of the K–T marks in this country prior to that of Koppers Co.; or some transaction between the parties which either (2) assigned the rights to the marks in this country to Krupp-Koppers, or (3) prevents Koppers Co. from asserting a right to their use.

The history of the use of the K–T marks is bound up with the history of the K–T process. As has been pointed out herein,

the process was developed by Dr. Friedrich Totzek, an employee of Heinrich Koppers GmbH, in Germany in the 1930's. It was demonstrated in experimental plants in Germany during World War II. After the War, the Allied Military Government published technical information about this process. This information became part of the public domain. Koppers Co. obtained it. Koppers Co. also renewed its working relationship with Heinrich Koppers GmbH which had existed before the War.

In 1948 Koppers Co. contracted to design and build a demonstration plant using this process for the United States Bureau of Mines. Koppers Co. obtained the services of Dr. Totzek and other Heinrich Koppers GmbH employees as consultants on the project. The record does not establish whether the K–T marks were used in connection with that plant.

Shortly after Koppers Co. entered into the contract for that plant, it entered into a contract with Heinrich Koppers GmbH relating to the process and to the marks. Three provisions of the contract are relevant here. First, by the contract, Heinrich Koppers GmbH sold to Koppers Co. its "entire title and interest . . . in and to all [its] patentable inventions and processes now existing or hereafter conceived or acquired which relate to [the process] . . . and the exclusive right to make, use and sell such inventions, processes and improvements in the United States . . . [and other specified countries]." Second, Heinrich Koppers GmbH promised to provide information and services to Koppers Co. to aid it in securing patents, to inform it of innovations, and to assist it in the design, construction and operation of plants using the process. Third, the parties agreed as follows:

> In recognition of the fact that Friedrich Totzek is the sole inventor of many of the inventions and processes transferred and assigned . . . to [Koppers Co.] pursuant to the provisions of this [contract, Koppers Co.] hereby agrees that all its offers for sale of any plant which utilizes any such invention, process or improvement, and all equipment construct-ed by it which embodies the same shall be designated by the phrase "Koppers-Totzek."

The contract was to continue until the end of 1958 and thereafter from year to year until either party gave notice of termination. The contract was extended in 1959 and was terminated in 1968.

■ After the contract was made, Koppers Co. offered its engineering services related to the process using the K–T marks to potential customers in the United States. The record does not show that Heinrich Koppers GmbH offered or sold either services or tangible goods using those marks in the United States during the term of the contract. In fact Koppers Co. never obtained a customer for its K–T process services during the term of the contract as extended. However, its public offering of those services under the K–T marks was a sufficient business use to establish a right in the marks.

■ This leaves two questions for this Court to resolve. Was the use of the K–T marks by Koppers Co. in subordination to superior rights of Heinrich Koppers GmbH? Did subsequent acts of Koppers Co. create superior rights to the marks in Heinrich Koppers GmbH or its successors? The answer to the first question turns on the provisions of the 1948 contract. Unfortunately the contract was not as clear concerning rights to the marks as it was concerning rights to the process. The contract plainly sold the Heinrich Koppers GmbH patentable inventions to Koppers Co. for exclusive ownership and use in the United States. This sale in addition to the process information in the public domain gave Koppers Co. extensive business rights in the United States in the process which is described by the marks. The contract did not declare which party owned the marks. Nor did it give Heinrich Koppers GmbH any control over the use of the marks or over Koppers Co.'s use of the process in the United States. Thus the contract provision dealing with the marks does not appear to be an assignment of the right to use the mark. See, e. g., *Sheila's Shine Products,*

*Inc. v. Sheila Shine, Inc.,* 486 F.2d 114 (5th Cir. 1973), *Robinson Co. v. Plastics Research & Development Corp.,* 264 F.Supp. 852 (D.Ark.1967), but *cf. Acme Valve & Fittings Co. v. Wayne,* 386 F.Supp. 1162 (D.Tex.1974), which might preclude Koppers Co. from asserting ownership of the mark.

Krupp-Koppers next claims that Koppers Co. abandoned its right to the marks by non-use during the 1960's. Section 45 of the Lanham Act, 15 U.S.C.A. § 1127, declares:

> A mark shall be deemed abandoned— (a) when its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Discontinuance of use for two consecutive years shall be prima facie abandonment.

Koppers Co. in fact ceased to use the K–T marks in the United States for a number of consecutive years during the 1950's and 1960's due to its failure to find customers for the K–T process. Nevertheless, it continued to employ its engineers who were familiar with the process, to maintain its technical files concerning the process and to hold registered patents related to it. It even negotiated a ten year extension of the 1948 contract in 1958, two years after it suspended its use of the marks and its attempts to sell the process in the United States.

■ The K–T marks are not registered under federal law. Therefore the two-year discontinuance presumption of the Lanham Act does not apply to Koppers Co.'s rights to the marks. Even so, the common law right to the marks could be lost by abandonment. Whether they were lost depends on whether Koppers Co. intended to abandon the rights. 3 Callman, Unfair Competition, Trademarks, and Monopolies § 79.2 at 518 (3d ed. 1969). Koppers Co.'s discontinuance of use rested on a judgment that the process was not then marketable in the United States rather than on a decision to cease business altogether or to relinquish for all time the marketing of the process and the use of the marks. This Court finds

that Koppers Co. did not intend to abandon its right to the marks. Therefore this Court holds that Koppers Co. did not abandon that right.

■ Even if the record had established that Koppers Co. abandoned its right to the K–T marks, this would not establish Krupp-Koppers' right to a preliminary injunction. Abandonment would merely return the marks to the public domain. *Id.* at § 79. It would not establish a superior right in Krupp-Koppers. Such a right could arise only by actual use of the mark in this country by Krupp-Koppers before Koppers Co. resumed its use of the marks. Krupp-Koppers has not demonstrated such a use.

In the early 1970's, Koppers Co. management became aware of impending shortages of natural gas and of fuel oil. They decided to revive their work in coal gasification and synthetic fuels in anticipation of the predicted changes. As part of that process Koppers Co. negotiated a new contract with Heinrich Koppers GmbH in 1972. That contract gave Koppers Co. access to Heinrich Koppers GmbH current technology related to the K–T process. The 1972 contract again referred only obliquely to the rights of the parties to the K–T marks in the United States. It declared

> This process has been and still is propagated under the designation KOPPERS TOTZEK PROCESS, hereinafter to be called KT process. . . .

> The designation KT process also covers all future modifications of the process which do not deviate from the essential features of the original process as described previously herein.

The contract was, in other respects, a conventional license of technology agreement licensing Koppers Co. to use existing and future technology relating to the process in exchange for fees. The contract also called for Heinrich Koppers GmbH to provide engineering assistance in plant design. It provided for the confidentiality of information supplied to Koppers Co. under the agreement, and for the return of that information, insofar as this could be done, upon

the termination of the contract. The contract expressly recognized, however, that Koppers Co. already possessed significant information about the process.

It is clear that the 1972 contract did not create a common law right to the K–T marks in Heinrich Koppers GmbH in the United States. Neither did it convey to Heinrich Koppers GmbH the existing Koppers Co. right to the marks. While the 1972 contract continued, Koppers Co. acted in many respects as a process licensee of Heinrich Koppers GmbH. Still it owned significant rights in the process, and it certainly was able to continue to own the marks by which the process was known in the United States.

For these reasons it appears to this Court that Krupp-Koppers has not satisfactorily shown that it is likely to prevail on the merits of its counterclaim. Its application for a preliminary injunction is therefore denied.

### Conclusion

For all of the foregoing reasons, the plaintiff's request for injunctive relief with respect to KOPPERS will be granted and the defendant will be enjoined *pendente lite* from using the mark or name KOPPERS in the United States. Plaintiff's request for a preliminary injunction with respect to defendant's assertions of ownership of the coal gasification process will be denied. Defendant's motion to enjoin plaintiff from using the marks KOPPERS–TOTZEK and K–T will be denied. The foregoing shall constitute findings of fact and conclusions of law under F.R.Civ.P. 52(a).